533 So.2d 497 (1987)
NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY
v.
Mattie HOLLEY.
Sam WATTS
v.
Mattie HOLLEY.
84-1211, 84-1223.
Supreme Court of Alabama.
September 18, 1987.
Rehearing Denied November 6, 1987.
On Return from Remand September 16, 1988.
Ollie L. Blan, Jr., of Spain, Gillon, Riley, Tate & Etheredge, Birmingham, for appellant North Carolina Mut. Life Ins. Co.
W. Troy Massey, of Massey, Means & Thomas, Montgomery, for appellant Sam Watts.
Ernest C. Hornsby and Steven F. Schmitt, Tallassee, and Billy L. Carter, Montgomery, for appellee.
Rehearing Denied in No. 84-1211 November 6, 1987.

ON APPLICATION FOR REHEARING
PER CURIAM.
The original opinion in this cause is hereby withdrawn and the following opinion is substituted:
This is a fraud case. The issue presented is whether plaintiff, the beneficiary of a life insurance policy issued on the life of her daughter, could recover for an alleged misrepresentation made by the insurance company's agent at the time the application for the policy was made by the daughter. The insurance company refused to pay benefits *498 due under the terms of the policy on the ground that the daughter had falsely stated the condition of her health at the time she made the application, and that the daughter had cancer at that time and was uninsurable.
The trial court entered a $1 million judgment based on a jury verdict. The defendants brought these appeals from the denial of their motions for JNOV or new trial. The two appeals have been consolidated.

FACTS
On April 1, 1982, as a part of a "special offer" campaign of defendant North Carolina Mutual Life Insurance Company to existing policyholders, defendant Sam Watts, a soliciting agent of North Carolina Mutual, took an application for a $2,000 policy of life insurance from Patricia Holley, who was to be the insured and the owner of the policy. She paid the initial premium for the policy and named her mother, the plaintiff, Mattie Holley, as beneficiary. On June 20, 1983, Patricia Holley died of cancer. Mattie Holley made a claim to North Carolina Mutual for the $2,000 proceeds of the policy. After investigation, North Carolina Mutual determined that Patricia Holley had had cancer since the summer of 1981, and was, therefore, uninsurable at the time the policy was issued. The company denied the claim because of a policy provision that stated that the policy did not take effect unless it was issued and delivered while the insured was in good health. A refund of the premiums was tendered to Mattie Holley, who refused to accept it.
The evidence was in dispute, but there was strong evidence from which the jury could have found that Watts, when he took the application, knew that Patricia Holley had cancer, and would live no longer than two to five more years. The policy had a two-year incontestability clause. Patricia Holley, as owner of the policy, reserved the right to change the beneficiary.
The question of what causes of action, if any, Patricia Holley would have had against the defendants if she had initiated an action during her lifetime is not before this Court. This is a suit brought by Mattie Holley, individually.
The alleged misrepresentation made the basis of the fraud claim consisted of the following statement alleged to have been made by defendant Watts to the plaintiff, Mattie Holley, the beneficiary of the $2,000 policy and the mother of Patricia Holley: "Mattie, you'll be the beneficiary of this policy if anything happens to Pat to help with funeral expenses." Watts denied making this statement. Mattie Holley was deposed twice before trial and filed an affidavit in opposition to defendants' motion for summary judgment, and in neither of the depositions, nor in the affidavit, did she refer to the above quoted statement, or to any similar statement that Watts made directly to her. Mattie Holley contends that she was not asked during either deposition a question which would have elicited such testimony. Defendants contend that the statement was fabricated by Mattie Holley during the time between the depositions and the trial, so that she could remain in court. Admittedly, there are several areas in which Mattie Holley's testimony at trial could be said to contradict her testimony given in the depositions, but in each instance, she testified at trial that she had made a mistake in her prior sworn testimony. These inconsistencies in her testimony were pointed out to the jury, and the jury as the trier of fact apparently determined that her trial testimony was credible.
There was evidence from which the jury could have found, as it evidently did, that Watts told Mattie Holley: "Mattie, you'll be the beneficiary of this policy if anything happens to Pat to help with funeral expenses." For our purposes, we must assume that the statement was, in fact, made. The policy was issued, and, thereafter, either Patricia or Mattie Holley paid the monthly premium of $4.22 on the policy for the next 13 months.

I
The threshold question this Court must resolve is whether the statement made by Watts to Mattie Holley constitutes *499 a misrepresentation on which an action of fraud can be based.
As Justice Beatty wrote in Harrell v. Dodson, 398 So.2d 272 (Ala.1981):
"The elementary rule is that evidence of misrepresentation of a material fact must be shown to support a claim for damages on account of a misrepresentation. Code 1975, § 6-5-101."
Whether a given representation is an expression of an opinion or a statement of fact depends upon all the circumstances of the particular case. Harrell v. Dodson, supra.
Under the circumstances of this case, we hold that the statement allegedly made by Watts is a statement of a material fact.
The circumstances of this case bear some striking similarities to those of National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980), in which a niece brought an action, individually and as administratrix of her aunt's estate, to recover for fraud and misrepresentation and conspiracy to defraud and to misrepresent in regard to the sale of health policies covering the aunt, after claims under the policies were denied for alleged misrepresentations in the application. In that case, the following issues were presented:
"(1) Does plaintiff have standing?
"(2) Is the action barred by the statute of limitations?
"(3) Is evidence of National States' loss ratios admissible?
"(4) Is a tape recording of a sales meeting admissible to show intent to defraud?
"(5) What is the status of the agents involved and was it such that it created liability for the company?
"(6) Did plaintiff waive her right to sue by accepting the return of premiums?
"(7) Did plaintiff sustain actual damages? Were punitive damages proper? Was the jury verdict excessive and the remittitur proper?"
In that case, this Court, with seven Justices concurring in the opinion, found that the plaintiff niece had standing even though she was not the applicant, the insured, the beneficiary, or the owner of the policies at issue.
As earlier indicated, this case has some striking similarities to that case. In each case, an application for an insurance policy was made by the insured, who was related to the plaintiff. In each case, the plaintiff occupied a special relationship with the insured, and was involved to some degree in the application process; the plaintiff in each case had assumed some responsibility for the care of the insured; and the benefits payable under the policy, in each case, would have been beneficial to the plaintiff in paying any obligations arising out of the plaintiff's assumption of responsibility for the care or burial of the insured.
In this case, the plaintiff was the named beneficiary. In the National States case, the plaintiff was not the named beneficiary. In each case, there was evidence that the plaintiff paid either all of the premiums or some of the premiums. In each case, a claim was filed for benefits payable under each policy, and the defendant insurer, in each case, denied the claim because of alleged misrepresentations in the application by the insured. In both cases, there was evidence that the insured and the plaintiff both knew that the insured had health problems at the time the application was made. Neither the insured nor the plaintiff in either case informed the defendant's agent of the health conditions. In National States, the plaintiff was present when the defendant's agent was questioning the insured, but did not answer the questions. In this case, the plaintiff was not in the room at the time of the questioning by the agent and did not hear the questions. In National States, there was no evidence that the defendant's agent was aware of the condition of the insured. In this case, there was evidence that the insurer's agent did know that the insured had cancer.
There are other similarities between this case and National States. The training methods for sales persons employed by the two insurance companies were similar. In each case, the policies and information concerning *500 the policies were sent from the home office to the agents. The two companies prescribed the presentation to be made by the agents. There were training sessions conducted by the sales manager concerning the presentation to be made to applicants. In National States, one of the sales meetings was partially taped, so there was evidence in that case of what transpired during that sales meeting. Here, there was evidence that during the training session the agents were told that the medical portion of the application was not required.
In making the application, there was evidence that the insured in this case answered two questions falsely. Also, there was evidence that the insured knew she had cancer, and she should have been aware that she was giving false information on the application form, but the jury may have found this fact to be insignificant here.
During the trial, the chief underwriter for North Carolina Mutual, testified:
"Q Now, Ms. Cogwell, what type of an application is required for a special offer?
"A The same application that we use for our regular business except the nonmedical or medical is not a part of it.
"Q Ordinarily the application part of it is called part one, is it not?
"A Correct.
"Q And the part that has the medical questions on it is called part two?
"A Correct.
"Q And on a special offer you require the part one to be filled out and turned in?
"A Yes.
"Q You do not require part two; is that correct?
"A No."
Here, there was evidence that when Watts arrived at the plaintiff's house, he said, in her presence and in the presence of the insured, that he had an insurance policy for the insured with "No medical questions asked." (Emphasis added.)
Watts took the application and then sent it to the home office. Watts did not tell Patricia or the plaintiff that she had to be in good health in order to be insured under this policy because "she was assumed" to be in good health by the company. There is some evidence that Watts made these statements after being specifically told not to take applications from people in bad health.
We are of the opinion that the factual setting in this case is so similar to the factual setting in National States that the principle of law in that case is controlling here. While the evidence here of an intent to defraud may not be as clear as in National States, we find it was sufficient to support a claim of fraud.
We have also made a comparison of the factual setting here with the factual setting in Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981), and we are of the opinion that even though in Aspinwall the plaintiff was the insured and here the plaintiff is the beneficiary, we are of the opinion that the representations made here were statements of fact rather than statements of opinion. We can see no significant difference in the statement by the agent here, "Mattie, you'll be the beneficiary of this policy if anything happens to Pat to help with funeral expenses," and the statement made in Aspinwall by the agent that he would "fix it where it would definitely pay." See, Group Hospital Services, Inc. v. Daniel, 704 S.W.2d 870 (Tex.Ct.App.1986) (beneficiary allowed to maintain a fraud action against insurer for agent's representations that treatment at an allergy treatment facility would be covered, but appellate court found that evidence did not support an award of punitive damages, because there was no evidence presented of an intent to deceive).
We are also of the opinion that the decision of this Court in this case is consistent with the principle of law this Court set forth in Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496 (Ala. 1984). There, a subcontractor installing piles for an addition to a hospital brought an action against the hospital and the architect, in which it sought additional compensation to recover what it had expended *501 because of unaccepted piles. The hospital claimed that there was no privity of contract between it and the subcontractor, and that it owed the subcontractor no duty, and that the subcontractor was not a third-party beneficiary of any contract it had made with another. This Court, in reversing a summary judgment granted in favor of the hospital, stated:
"Providence argues that Berkel cannot enforce Providence's duties under a contract with others absent privity or third-party beneficiary status. Twine v. Liberty Nat'l. Life Ins. Co., 294 Ala. 43, 50, 311 So.2d 299, 305 (1975). Providence misconstrues the basis of duties in negligence actions. A plaintiff may argue that another party owes a duty under a contract upon which the plaintiff reasonably relied. McGaha v. Steadman, 410 So.2d 420, 421 (Ala.Civ.App.1981); Federal Mogul Corp. v. Universal Constr. Co., 376 So.2d 716, 724 (Ala.Civ.App. 1979). Alternatively, a plaintiff may argue that another party has duties independent of any contract because that party has acted affirmatively. Dailey v. City of Birmingham, 378 So.2d 728, 729 (Ala.1979); Herston v. Whitesell, 374 So. 2d 267, 270 (Ala.1979); McGaha v. Steadman, 410 So.2d 420, 421-22 (Ala.Civ.App. 1981). This latter proposition is the basis of count one. Providence can be held liable for negligence injuring third parties, whether or not Providence has a similar duty under contract to some others. The existence of a collateral contract does not negate the obligation imposed in tort to act reasonably. In this case, we need not consider whether an unreasonable omission to perform a contract duty can ever create liability to third parties in a construction setting.
"In this case, Berkel does not seek to impose contract duties on Providence or its agents. Instead, Berkel contends that by affirmatively embarking on a course of conduct (whether or not this exercise sprang from a contract setting), Providence assumed a duty to third parties to act reasonably. We recognize that contracts may impose greater or lesser degrees of responsibility and that third parties are generally not entitled to benefit from contract standards which differ from the standard of care generally applicable in negligence actions. See Note, `Architectural Malpractice: A Contract-Based Approach,' 92 Harv.L.Rev. 1075, 1087-88 (1979).
"Providence argues further that even if privity is not a defense, the facts disclosed that no duty was owed to Berkel. In deciding whether to impose a duty in a construction context, the trial court should analyze six factors:
"`"(1) [T]he extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm."'
"Howe v. Bishop, 446 So.2d 11 (Ala.1984) (Torbert, C.J., concurring in the result), quoting from United Leasing Corp. v. Miller, 45 N.C.App. 400, 406-07, 263 S.E. 2d 313, 318 (1980). Under this standard, Providence clearly owes Berkel a duty to act reasonably in directing and approving pile construction work. The transaction was intended to affect Berkel, and it was foreseeable that it would. The alleged harm is certain and directly connected to Providence's conduct. Given the business relationship and lack of personal injury, the question of moral blame is not relevant in this case. The final factor, the policy of preventing future harm, also supports the finding of a duty. Providence could have averted the alleged loss either by not acting or by acting reasonably. This Court will impose liability on Providence to require it to act responsibly."
454 So.2d at 502-03.
Although Berkel involves a construction contract, and was not an action based on any alleged fraud, we think that the elements set out in that case as being necessary to show the existence of a duty are present in this case.

*502 II
The last issue we address is North Carolina Mutual's claim that the verdict was excessive.
We do not, at this time, decide this issue, but we remand the cause to the trial court to review its judgment in accordance with the guidelines set out in our recent decisions in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Harmon v. Motors Insurance Corp., 493 So.2d 1370 (Ala. 1986); and Alabama Farm Bureau Mutual Cas. Ins. Co. v. Griffin, 493 So.2d 1379 (Ala.1986).
The trial court, in its discretion, may or may not order a further hearing to reconsider the claim that the verdict is excessive. In any event, the trial court is directed to report its findings and conclusions within 28 days of this opinion.
APPLICATION FOR REHEARING GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED, IN PART; REMANDED WITH DIRECTIONS.
JONES, ALMON and SHORES, JJ., concur.
MADDOX and ADAMS, JJ., concur specially.
TORBERT, C.J., and BEATTY, HOUSTON and STEAGALL, JJ., dissent.
MADDOX, Justice (concurring specially as to part I and concurring in the result as to part II).
On application for rehearing, based upon independent research on my part, I became convinced that this Court's case of National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980)[1], was so similar to this case that it compelled me to agree with the applicant for rehearing that this case should be affirmed on the merits; consequently, I concur in the opinion on the merits as to the affirmance of the judgment imposing liability, but in regard to the remand, I concur only in the result.
Prior to the decision of this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), this Court, in similar cases, took action pursuant to the authority granted this Court by Code 1975, § 12-27-71, and determined, without remanding the case, whether a particular judgment was excessive. Since Hammond, however, we have followed the procedure we adopted in that case to remand other cases similar to this to the trial court for a determination in accordance with the principles set out in Hammond. There is one exception to that procedure. In Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987), we affirmed the case conditionally, without remand, and opined at 1053-54:
"Under ordinary circumstances, we would remand this cause to the trial court for reconsideration of the excessiveness-of-the-verdict issue pursuant to Hammond v. City of Gadsden, 493 So. 2d 1374 (Ala.1986). Because of the long history of this case, and other extraordinary attending circumstances, however, we feel constrained to forgo the Hammond remand procedure and determine the issue of damages without further delay. After careful and thoughtful consideration, taking into account the gravity of the wrong, the nature and extent of the injury inflicted upon the insureds, and, upon making a comparative analysis with other awards allowed in similar cases, we hold that the trial court's order denying the insurer's motion for a new trial should be affirmed on the condition that the insureds file with this Court within twenty-one days a remittitur of damages in the sum of $3,000,000; otherwise, the judgment will be reversed and this cause remanded for a new trial."
In cases similar to this one, prior to Hammond, of course, we affirmed the judgments conditionally, as we did in Aetna Life Ins. Co. v. Lavoie, supra, without *503 remand. See, e.g., Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981) (award of $1 million in punitive damages was determined to be excessive by this Court; affirmance conditioned on appellees' filing a remittitur in the amount of $750,000, affording the plaintiff a judgment on the fraud count of $250,000); Gulf Atlantic Insurance Co. v. Barnes, 405 So.2d 916 (Ala.1981) (the award of $1,100,000 in damages was held by this Court to be excessive and this Court ordered a remittitur in the amount of $1 million).
Although I concur in the result to remand under the principles of Hammond, I want to call to the attention of the trial court, and the parties, some additional facts that were not present at the time of the trial court's initial consideration of the claim that the verdict was excessive. Since the trial judge ruled on appellant's motion for new trial, the Supreme Court of the United States, in Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986), while not basing its judgment upon Aetna's claim that the verdict rendered in that case was excessive under the "Excessive Fines" clause of the Eighth Amendment to the Constitution of the United States, did note:
"Appellant also argues that the retrospective imposition of punitive damages under a new cause of action violates its rights under the Contracts Clause of Article I, Section 10; that a $3.5 million punitive damage award is impermissible under the Excessive Fines Clause of the Eighth Amendment; and that lack of sufficient standards governing punitive damage awards in Alabama violates the Due Process Clause of the Fourteenth Amendment. In addition, appellant contends that Ala.Code § 12-22-72 (1975), under which any person who unsuccessfully appeals a money judgment is assessed 10% penalty, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. These arguments raise important issues which, in an appropriate setting, must be resolved; however, our disposition of the recusal-for-bias issue makes it unnecessary to reach them." (Emphasis added.)
Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986).
I specifically call the attention of the parties to the arguments made by the parties in the Supreme Court of the United States on the excessiveness issue in Aetna Life Ins. Co. v. Lavoie. Also, see my concurring opinion in Alabama Power Co. v. Cantrell, 507 So.2d 1295, 1306-10 (Ala. 1986), in which I discuss the question of the applicability of the "Excessive Fines" clause to a punitive damages award in a civil case. I further point out that in Bankers Life & Cas. Co. v. Crenshaw, 480 U.S. 915, 107 S.Ct. 1367, 94 L.Ed.2d 683 (1987), the Supreme Court of the United States has noted probable jurisdiction.[2]
*504 ADAMS, Justice (concurring specially).
I concur specially for clarification purposes. First, I hasten to point out that I have never had difficulty in deciding that the defendants were liable to the plaintiff. I am of the opinion that this case is on all fours with Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981). In that case, the insurance agent, knowing full well that the plaintiff was not insurable, told her that he would "fix it where it would definitely pay." Here, the agent told the beneficiary that she would have proceeds of the policy to help bury her daughter, the insured. Although the promise was made in Aspinwall to the insured, and the promise in the instant case was made to the beneficiary, I think that this is a distinction without a difference. As aptly pointed out in the per curiam opinion, the fact that there was a contractual relationship in the Aspinwall case between the insured and the insurance company, and no contractual relationship between the beneficiary and the insurance company in this, case is not decisive, because our cases are to the effect that a duty in a fraud action exists in the absence of a contractual relationship, or even without dealings between the parties. The duty arises under the special circumstances of the case. See Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496 (Ala.1984); Standard Oil Co. v. Johnson, 276 Ala. 578, 165 So.2d 361 (1964); Mid-State Homes, Inc. v. Startley, 366 So.2d 734 (Ala.Civ.App.1979). Each case must rest on its own facts.
Having stated that I had no difficulty in deciding on the liability in this case, I must also point out that, as in Aspinwall, I am troubled with whether a judgment in the amount of $1,000,000.00, under the facts in this case, is not excessive and a product of bias or prejudice. The judgment in Aspinwall was for $1,000,000.00 and we reduced it to $250,000.00. However, I will await the trial judge's statement on return to our Hammond-type remand.
A final clarification. I was recused on the original deliverance in this case. My recusal was because the original vote was five in favor of reversing the case and rendering a judgment for defendants, and three were of the opinion that the plaintiff should prevail. I would have made the fourth vote, but this would not have changed the outcome of the case. I also, mistakenly, thought I should recuse because nearly 40 years ago, when I first began practicing law, I took out a very small policy with the defendant North Carolina Mutual Insurance Company. When Justice Maddox decided to change his vote on rehearing in this case, the issue was presented squarely to me as to whether I should be recused. To continue as recused would have meant that some other person not elected by the people to this Court would have decided this important case.
As judges, we are bound by our Judicial Code of Ethics. Our Judicial Inquiry Commission accepts questions propounded to it concerning the propriety of a judge's actions in light of various sections of the Judicial Code. In an opinion, 76-IV, the Judicial Inquiry Commission has answered the question of whether a judge should disqualify himself if he is the owner of a life insurance policy with a mutual or stock company and that company is in litigation before him. The Commission's answer is that a judge is not required to disqualify himself unless the outcome of the proceeding would substantially affect the value of his interests. In my case, it does not.
HOUSTON, Justice (dissenting);
I agree with the majority that the threshold question this Court must resolve is whether the statement allegedly made by Watts to Mattie Holley constitutes a misrepresentation on which an action of fraud can be based.
I too rely on Justice Beatty's correct statement of law in Harrell v. Dodson, 398 So.2d 272 (Ala.1981):

*505 "The elementary rule is that evidence of misrepresentation of a material fact must be shown to support a claim for damages on account of a misrepresentation. Code 1975, § 6-5-101...."
I also agree that whether a given representation is an expression of an opinion or a statement of fact depends upon all the circumstances of the particular case. Harrell v. Dodson, supra.
Watts was not called to the Holley house for the purpose of obtaining insurance with which to pay Patricia's funeral expenses. He came on his own volition to present the special offer North Carolina Mutual was making to its existing policyholders. Patricia was one of North Carolina Mutual's insureds to whom this special offer was made. No presentation of the policy was made to plaintiff Mattie Holley. After opening remarks, she retired to the kitchen to prepare dinner, while Watts and Patricia discussed the policy in the living room. The application was filled out in the living room, with just Watts and Patricia present. The plaintiff, Mattie Holley, went to the living room in time to see Patricia sign her name to the application. It is at that time that Watts is said to have made the unsolicited statement to the plaintiff. The statement by Watts was completely voluntary on his part. It was not made in response to questions. He owed no duty to Mattie Holley to say anything about the policy, nor did he have any obligation (or, perhaps, even a right) to give her any information concerning the policy. At the time, Mattie Holley had furnished no consideration for the policy and would have had no legally enforceable claim to the policy or its proceeds until Patricia's death. Patricia was the owner of the policy and had the right to name whomever she chose as the beneficiary. Patricia had the right at any time during her lifetime to change the beneficiary to someone other than Mattie Holley. Mattie Holley had only an expectation. Watts had sold 12 other policies to the Holley family; he was their policyman.
With all of this in mind, we must examine any of the three versions of the statement Watts allegedly made to Ms. Holley. The undisputed evidence was that Mattie Holley was, at the time the alleged statement was made, the designated beneficiary in the application for the policy (her name was on the application), and that she remained the beneficiary in the policy until Patricia's death. As previously noted, Watts owed no duty to Mattie Holley to tell her anything about the policy at the time the statement was made. The statement is nothing more than an unsolicited, voluntary opinion on the part of Watts to the plaintiff. Watts had no way of knowing who would be the beneficiary of the policy at the time of Patricia's death. Patricia alone had the right to designate a beneficiary; she could have changed the beneficiary at any time prior to her death. If Watts had said "Mattie, you have been designated the beneficiary of this policy," that would have been a correct statement of an existing fact; it would have been true and thus not a misrepresentation of a material fact. However, what Mattie Holley testified that Watts said is not a statement of a material fact, which under Alabama law is a necessary element of an actionable misrepresentation. This utterance is not even a promise. It is nothing more than a speculation as to something that might take place in the future. In Alabama, fraudulent misrepresentation actions cannot be based upon mere expressions of opinion. Lawson v. Cagle, 504 So.2d 226 (Ala.1987); D.H. Holmes Dept. Store v. Feil, 472 So.2d 1001 (Ala.1985); Harrell v. Dodson, supra.
While the statement made by Watts to Mattie Holley on April 1, 1982, was no more than an opinion, on which Mattie Holley had no right to rely, the subsequent payment of premiums by Mattie Holley may be evidence of reliance, which is another essential element of fraud, Russellville Production Credit Ass'n v. Frost, 484 So. 2d 1084 (Ala.1986), but this in no way transforms the statement of opinionon which she had no right to relyinto a statement of material fact and, consequently, does not furnish any evidence of the essential element of "misrepresentation of a material fact."
*506 After thoroughly reviewing Mattie Holley's position in the excellent brief filed by her most competent attorneys and thoroughly reviewing the "monosyllabic absidarian statement" requested by the trial court from Mattie Holley's attorneys at the close of the evidence as to what they considered to be the fraud. At least one essential element, misrepresentation of a material fact, is totally missing. There is no evidence of this essential element. Therefore, I believe that the trial court erred in not granting the defendants' motions for directed verdict made at the close of Mattie Holley's case and renewed at the close of all of the evidence. Likewise, I believe that the trial court erred in failing to grant defendants' motions for judgment notwithstanding the verdict. I would reverse and render a judgment for the defendants; therefore, I dissent.
There are issues, interesting and important issues, that should be addressed by the majority, since it affirms conditionally. These include: (1) permitting challenges for cause because of an unwillingness, regardless of the evidence, to award $1 million in punitive damages for fraud in an action based on an insurance company's refusal to pay a $2,000 life insurance policy; (2) the propriety of trial counsel's statement, in closing argument, that the jurors' prior assurance, expressed on voir dire, that they would not be hesitant or reluctant to return a $1 million verdict against an insurance company and its agent merely because it was a large sum of money, mandated that the jury return a substantial verdict for the plaintiff under the facts in this case; (3) a principal's ratification of an agent's unauthorized acts; and (4) excessiveness of the verdict. The majority addresses only the issue of excessiveness. I address none of these, since I would reverse and render a judgment based on the issue previously discussed in this dissent.
TORBERT, C.J., and BEATTY and STEAGALL, JJ., concur.

ON RETURN FROM REMAND
PER CURIAM.
The Court affirmed the judgment on the merits, but remanded this cause to the trial court "to review its judgment in accordance with the guidelines set out in our recent decisions in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Harmon v. Motors Insurance Corp., 493 So.2d 1370 (Ala.1986); and Alabama Farm Bureau Cas. Ins. Co. v. Griffin, 493 So.2d 1379 (Ala.1986)."
Pursuant to this Court's order, the trial judge held a hearing and, on December 18, 1987, entered an order refusing a remittitur of the $1,000,000 judgment entered upon the jury verdict. We do not set out the trial judge's complete order, but we do include the following pertinent findings:
"We[[1]] have reviewed the evidence in this case, the verdict of the jury, and all proceedings relevant to this case, from impanelling the jury to post-trial motions, and we have applied the standards and tests set out in Hammond, and we have found no reason or ground to order a remittitur.... We have looked for, but have not found, bias, passion, prejudice, corruption or other improper motive affecting the jury or its verdict, or any other aspect of the trial. The verdict is justified by the evidence in this case, as will be discussed below.
". . .
"Can it be said that the $1 million verdict in this case is excessive as a matter of law? Let us look at the facts. Sam Watts was a friend of the Holley family; he was their insurance man, and they trusted him. His conduct can be interpreted one of two ways: either he `bent the rules' in an attempt to help Mattie Holley, or he took advantage of Mattie Holley, a poor, illiterate and elderly friend who trusted and relied on him. The jury found the latter; the jury found that Sam Watts intentionally took advantage of Mattie Holley, and such a finding is fully justified by the evidence. The jury also found that North Carolina *507 Mutual either authorized or ratified Sam Watts' conduct, and such a finding is fully justified by the evidence.
"In this case, the enormity of the wrong is great, as is the culpability of the wrongdoer. A large and substantial fine is justified, and called for, to punish this wrongdoing and to prevent similar wrongdoing in the future. In light of the facts in this case, is the verdict of $1 million excessive as a matter of law? We think not, and we find that the verdict is not excessive as a matter of law."
The parties filed briefs in this Court, and the matter was again submitted to this Court to determine whether the award of $1,000,000 was excessive.[2]
In connection with the submission in this Court after remand, counsel for both parties filed separate affidavits. North Carolina Mutual's counsel filed an affidavit styled "Affidavit in Connection with Hammond Remand Hearing," in which he averred, among other things, the following:
"During the course of the hearing there was considerable discussion about the statements in the concurring opinions of Justices Maddox and Adams of their concerns about the unconstitutionality of punitive damages and the excessiveness of the $1,000,000 award in this case. Thereafter the plaintiff's attorneys, without any solicitation from the trial court, voluntarily stated to the trial court that they would suggest a remittitur in the amount of $500,000 and further stated they had been authorized by their client to agree to a remittitur in that amount."
Counsel for Mattie Holley filed what could be styled a counter-affidavit, in which he averred, among other things, the following:
"Plaintiff's counsel, because of the similarity of the instant case with National States Insurance Co. v. Jones, 393 So.2d 1361 (Ala.1980), in which case the Supreme Court affirmed the trial court's remittitur of a $3,500,000.00 jury verdict down to $500,000.00, announced to the court if it ordered a remittitur up to but not to exceed $500,000.00 it would be accepted by Mattie Holley. This announcement was further encouraged by the Supreme Court's action in Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050 (Ala.1987), where the Supreme Court remitted the damages down to $500,000.00. Justice Maddox had mentioned these two opinions in his special concurrence. Further, Justice Adams mentioned Aspinwall v. Gowans, [Gowens] 405 So.2d 134 (Ala.1981) in which a $1,000,000.00 jury verdict was remitted down to $250,000.00. Therefore, to be helpful to the trial court, counsel for Mattie Holley made these disclosures and argued specific facts of wrongdoing in the record respecting not only the agent, Sam Watts, but serious wrongdoing in the claims handling process by home office personnel of NCM."
In view of the foregoing, we are of the opinion that the record in this case is sufficient to sustain a jury verdict in favor of the plaintiff Mattie Holley on the fraud claim, but not in the amount of $1,000,000. See National States Insurance Co. v. Jones, 393 So.2d 1361 (Ala.1980); Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050 (Ala.1987); and Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). Consequently, based on the record in this case, and the fact that plaintiff's counsel stated that "if [the trial court] ordered a remittitur up to but not to exceed $500,000.00 it would be accepted by Mattie Holley," and based further upon the authority of Ala.Code 1975, § 12-22-71, we affirm the judgment of the trial court on the fraud count conditioned upon Mattie Holley's filing with this Court within 14 days of this opinion a remittitur in the amount of $500,000, affording plaintiff a $500,000 judgment on the fraud count; otherwise, the judgment appealed from on the fraud count is reversed and the cause is remanded for a new trial.
AFFIRMED CONDITIONALLY.
*508 JONES, ALMON and SHORES, JJ., concur.
MADDOX and ADAMS, JJ., concur specially.
TORBERT, C.J., and BEATTY, HOUSTON and STEAGALL, JJ., dissent.
MADDOX, Justice (concurring specially).
I concur in affirming the judgment on the condition that the appellee file with this Court a remittitur of $500,000 of the judgment obtained, thereby affording the appellee a judgment in the amount of $500,000.
On original deliverance, in a special concurrence, I pointed out some of the considerations that guide me in determining the "excessiveness" question. At that time, I specifically mentioned the fact that the Supreme Court of the United States in Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), had indicated that it might consider "in an appropriate case" whether the standardless imposition of punitive damages in a civil case was violative of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States because of the Eighth Amendment's prohibition against the imposition of "excessive fines." As I further pointed out in my special concurrence, I thought the "appropriate case" was before the Supreme Court of the United States in Bankers Life & Cas. Co. v. Crenshaw, 486 U.S. ___, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1987), as to which the Court had noted probable jurisdiction.
Since I filed my special concurrence in this case, this Court has decided the Aetna case, and it affirmed the judgment of the lower court on the condition that the appellees there file with the trial court a remittitur of all but $500,000 of the $3.5 million judgment. Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987). In a lengthy special concurrence in that case, I pointed out the history of the development of the law establishing causes of action in this state against insurance companies for failure to pay claims, and I pointed out the public policy considerations and specifically called upon the Legislature to address those public policy issues.
I was hopeful that the Supreme Court of the United States would address the question of whether punitive damages awards in civil cases were covered under the Excessive Fines clause of the Federal Constitution in the Bankers Life case, which was pending in that Court when I authored my special concurrence in this case. The Supreme Court of the United States, however, decided the Bankers Life case in the term just concluded, and it did not reach the constitutional question. Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. ___, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). I do note that the Supreme Court of the United States has noted probable jurisdiction in another case that could squarely present the issue the Court did not reach in Bankers Life, supra.
Having no guidance from the Supreme Court of the United States at this time, we must decide the issue presented in this case without the benefit of an opinion from that Court, but as I expressed in a special concurring opinion in Alabama Power Co. v. Cantrell, 507 So.2d 1295, 1308 (Ala.1986), "[m]y review of the history of the Excessive Fines Clause of the Eighth Amendment and its English antecedents convinces me that the clause may be broad enough to cover punitive damages awards in civil cases." (Emphasis original.)
For the purposes of this case, I assume, as I did in Alabama Power Co. v. Cantrell, that the Excessive Fines clause does apply, but even assuming that it does apply, I concur in the conditional affirmance. The reasons for my belief that a $500,000 fine would not be excessive are as follows:
1) The fact that the conditional affirmance authorizes the recovery of $500,000, which is the amount of recovery authorized in National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980), and in Aetna Life Ins. Co. v. Lavoie, supra. I concurred in both of those judgments.
2) The trial court's specific finding that "the jury found that Sam Watts [North Carolina Mutual's agent] intentionally took advantage of Mattie Holley," *509 whom the trial judge characterized as "a poor, illiterate and elderly friend who trusted and relied on him", and that North Carolina Mutual ratified this conduct.
3) Evidence that North Carolina Mutual allotted a certain number of the "special offer" policies to its agents and encouraged their agents to sell them to existing policyholders, and that the "medical part" of the application was not required to be completed.
In my special concurrence in the Aetna case, I spelled out some of the problems and public policy considerations present in this type of case:[1]
"The same public policy considerations which plagued me in Chavers [v. National Sec. Fire & Cas. Co., 405 So.2d 1 (Ala.1981)], when the tort was recognized, continue to plague me, and those public policy considerations are: What type of remedy should be employed when an insurer fails to pay a valid claim made by its insured? What is the measure of damages? Should this Court be deciding these public policy issues? In Continental Assur. Co. v. Kountz, 461 So.2d 802 (Ala.1984), I articulated succinctly my own individual views concerning how I thought this Court should treat these `bad faith' cases, in the absence of legislative action. There, I wrote:
"`These "bad faith" cases, unfortunately, in my opinion, fail to give to the bench and bar some settled principles to guide them in determining when, and under what circumstances, the tort can be established. That is the reason I consistently dissented, until I joined every member of the Court in National Security Fire and Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984), in which this Court concluded that a plaintiff had a very heavy burden in establishing a bad faith failure to pay, and that that burden was to show that the insurer, to quote from Vintson, "had no legal or factual defense to the insurance claim." The Vintson test at least provided a more objective standard which trial judges, lawyers and appellate judges could apply....'
"461 So.2d at 811.
"Because I was the lone dissenter, I felt compelled to state the reasons for my dissent. I stated the following:
"`By dissenting in this case, and in others presented to this Court, I may appear to believe a plaintiff in a case such as the present one should be limited to his usual contract damages, but I have no such views, and have never entertained them. The Chief Justice, in his dissent in Lavoie, using a principle which I have long held to be the law, has suggested what I believe would be a sound rule of law to establish in these insurance contract cases. He suggested that this Court should adopt a rule that would restrict the cause of action, in situations such as exist here, to one sounding in contract, but expand the contractual damages rules for non-commercial insurance contracts. To me, that would be a just and fair rule which could be easily applied, and would be a rule this Court could unanimously adopt. Of course, the Legislature is the body normally relied upon to correct any ills which might exist in the insurance industry regarding payment of insurance claims, but in the absence of legislation, I would favor a rule of law which would allow the recovery of consequential damages, including reasonable attorneys' fees, when a party is forced to go to court to establish his claim under an insurance policy.
"`The failure of insurers to promptly pay what policyholders consider just claims is of great public concern. That concern is evidenced by the proliferation of cases in which policyholders seek not only redress under the contract, but also punitive damages under a "bad faith" theory, and juries are responding with verdicts of such magnitude that this Court has seen fit to require remittiturs.
*510 "`As I have already stated, in our scheme of government, policy questions like this, especially since they involve the heavily regulated insurance industry, should properly be addressed by the Legislature, but the Legislature has not acted.
"`Another concern of mine is the fact that because of this Court's adoption of the "bad faith" tort, there very well may be instances when insurance companies pay claims which factually should be denied; nevertheless, the company opts to pay rather than face the possibility of a lawsuit. If those instances do occur, then premiums for all other policyholders necessarily rise to offset these added costs. On the other hand, there no doubt are instances when companies require policyholders to resort to a court suit, even though the factual basis for denial of a claim is questionable. The fairest rule, it would appear to me, in view of these two policy considerations, would be one which would allow any party to a noncommercial insurance contract, who is forced to go to court in order to recover his contract claim to recover his consequential damages as well, including reasonable attorneys' fees.
"`In summary, I believe the judicially created tort of "bad faith" has serious policy ramifications which could and should be addressed by the legislative body of our government. I, nevertheless, feel that, in some cases, damages in addition to those provided for by the contract are necessary to make the policyholder whole.
"`Consequently, I would apply the rule which I believe would be just in this case and would reverse the judgment awarding punitive damages, but would remand the cause to the circuit court for a determination of the consequential damages which the plaintiff suffered as a result of the breach.'
"461 So.2d at 811-812."
505 So.2d at 1057 (emphasis original).
The Legislature, during the 1987 Regular Session, adopted an act which relates to punitive damages in civil cases, and that act provides that "[a]n award of punitive damages shall not exceed $250,000.00, unless it is based upon ... (a) A pattern or practice of intentional wrongful conduct... or, (b) Conduct involving actual malice... or, (c) Libel, slander or defamation." Ala.Acts 1987, No. 87-185, § 2, approved June 11, 1987. I mention this Act merely to say that the Legislature has addressed the subject of punitive damages in civil cases, but, naturally, I do not comment on the Act's validity or make further comment, because the Act has no applicability to this case. I do note that the Legislature did not address what the Chief Justice and I have said regarding the proper resolution of the public policy considerations. I included those comments in my special concurrence in Aetna Life Ins. Co. v. Lavoie, 505 So.2d at 1058:
"I am still of the opinion that the Legislature is the appropriate branch of our government to pass on matters of great public concern such as exist in this area. It has the ability to hold public hearings, and the right to investigate the need for additional legislation, and it has the plenary power to balance the competing interests of the insured and the insurer, and arrive at a solution which will be in the best interest of the public.
"I was not alone in suggesting attractive alternatives to the tort of bad faith refusal to pay insurance claims, and in calling on the Legislature to address them. The Chief Justice, in his dissenting opinion in this case on the third appeal, suggested that the Court should consider alternatives. He noted:
"`By making it attractive to sue alternatively, or even exclusively, in contract, this Court could have avoided many of the problems associated with developing a new tort. As an added benefit, much of the appellate workload would be reduced in reviewing excessive jury awards of punitive damages, since punitive damages are not available in contract.'
"Aetna Life Ins. Co. v. Lavoie, 470 So.2d at 1080.
*511 "In his dissenting opinion, he further stated:
"`The whole question of bad faith by insurance companies might be an issue more properly addressed by the legislature. The existing regulation of the insurance industries is a public-policy recognition by this state that consumers need some protection in this field. A proper balance between the two competing policy objectives inherent in claims of first-party bad faith must be struck.'
"Aetna Life Ins. Co. v. Lavoie, 470 So.2d at 1080-81."
Based on the foregoing, I believe this Court has applied a standard, even though not perfect, for measuring the punitive damages award in this case, and based on the evidence in this case, and applying the law of damages to this evidence, I believe that a $500,000 award would not constitute an excessive fine under either our State or our Federal Constitution; therefore, I concur in the conditional affirmance.
ADAMS, Justice (concurring specially).
I concur in the Court's decision to uphold the trial court's judgment if Mattie Holley files a remittitur in the amount of $500,000.00. I do so because I was persuaded by the trial court's statements concerning what transpired at the trialthat there was not a trace of bias, passion, prejudice, corruption, or other improper motive affecting the jury or its verdict, and that the family insurance man took advantage of a poor, illiterate, and elderly friend who trusted and relied on him.
The precedents that I rely on are: National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980), and Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987).
NOTES
[1] On original deliverance, my independent research did not locate the National States case, but I thought the case bore some similarity to Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981).
[2] For a history of the Bankers Life case, and the issues presented on appeal to the United States Supreme Court, see 55 U.S.L.W. 3065:

"85-1765 BANKERS LIFE AND CASUALTY CO. V. CRENSHAW
"Mandatory appellate penaltyUnsuccessful defense appealPunitive damages.
"First ruling below (Miss.Sup.Ct. 483 So.2d 254):
"Judgment awarding injured man $20,000 actual and $1.6 million punitive damages against insurance company that refused to honor claim is affirmed; amount of punitive damages, constituting less than 1 percent of insurance company's financial net worth, cannot be said to shock judicial conscience.
"Second ruling below (Miss.Sup.Ct. 9/11/85):
"Court adds damages of $243,000, which are at rate of 15 percent, as provided for by statute.
"Questions presented: (1) Is Mississippi statute that automatically imposes on unsuccessful defendant-appellant mandatory penalty of 15 percent of any money judgment, irrespective of merits of appeal, but that imposes no corresponding burden on appeal by unsuccessful plaintiff-appellant, whether frivolous or not, unconstitutional under Equal Protection Clause? (2) Does $1.6 million punitive damage award against insurance company on insurance claim of $20,000 violate Excessive Fines Clause, or is award otherwise invalid under Contract and Due Process Clauses because award is grossly disproportionate to actual damages and vastly greater than any penalties prescribed by Mississippi legislature for similar or analogous improper business activities, or because award was imposed under standard of conduct newly formulated by court and applied retrospectively to conduct that occurred almost seven years before standard was announced?
"Appeal filed 4/25/86, by Theodore B. Olson, Larry L. Simms, Terence P. Ross, and Gibson, Dunn & Crutcher, all of Washington, D.C., and Charles G. Copeland, J. Tucker Mitchell, and Copeland, Cook, Taylor & Bush, all of Jackson, Miss."
[1] The trial judge used "we" throughout his order, although it was signed only by him.
[2] As pointed out in the dissenting opinion of Mr. Justice Houston, 533 So.2d at 504-506, this Court did not address other claims raised by the appellant, but we have considered those claims, and neither of those claims persuades us that there was prejudicial error to reverse the judgment.
[1] While this is a fraud case, rather than a "bad faith" case, the same considerations are present.