684 So.2d 685 (1996)
LIFE INSURANCE COMPANY OF GEORGIA
v.
Daisey L. JOHNSON.
1940357.
Supreme Court of Alabama.
April 26, 1996.[*]
*686 Davis Carr and James W. Lampkin II of Pierce, Carr, Alford, Ledyard & Latta, P.C., Mobile, Theodore B. Olson and Theodore J. Boutrous, Jr. of Gibson, Dunn & Crutcher, Washington, DC, for Appellant.
Sidney W. Jackson III and Robert J. Hedge of Jackson, Taylor & Martino, P.C., Mobile, Wyman O. Gilmore, Jr. of Gilmore & Gilmore, Grove Hill, for Appellee.
J. Fred Wood, Jr. and Terry McElheny of Dominick, Fletcher, Yeilding, Wood & Lloyd, P.A., Birmingham, for Amicus Curiae Amerex Corp.
T. Thomas Cottingham, F.A. Flowers III and Eric D. Franz of Burr & Forman, Birmingham, for Amicus Curiae USX Corp.
Bert S. Nettles, Mark D. Hess and Laura E. Proctor of London & Yancey, Birmingham, for Amicus Curiae Blue Cross-Blue Shield of Alabama.
*687 Larry W. Harper and W. Perry Webb of Porterfield, Harper & Mills, P.A., Birmingham, for Amicus Curiae Wausau Ins. Co.
Harry Cole and Terry A. Sides of Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, and Ken Wallis, Gordon T. Carter and H. Al Scott of Alfa Mutual Ins. Co., Montgomery, for Amici Curiae Alfa Mutual Ins. Co., Alfa Mutual Fire Ins. Co., Alfa Mutual General Ins. Co. and Alfa Life Ins. Corp.
Joseph B. Mays, Jr., Phillip J. Carroll III and Gregory B. Wormuth of Bradley, Arant, Rose & White, Birmingham, for Amicus Curiae Alabama Gas Corp.
J. Mark Hart of Olschner & Hart, P.C., Birmingham, and Ollie L. Blan, Jr. of Spain & Gillon, Birmingham, for Amicus Curiae Alabama Defense Lawyers Ass'n.
Jack Drake of Drake & Pierce, Tuscaloosa, for Amicus Curiae Alabama Trial Lawyers Ass'n.
Frederick T. Kuykendall III and Sam Heldman of Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, David Shelby of Shelby & Cartee, Birmingham, J. Cecil Gardner of Gardner, Middlebrooks & Fleming, Mobile, and David Denny of Baron & Budd, P.C., Dallas, Texas, for Amicus Curiae Mary Lambreth.
Robert D. Norman of Norman, Fitzpatrick, Wood & Kendrick, Birmingham, for Amicus Curiae University of Alabama Health Services Foundation, P.C.
C.C. Torbert, Jr. of Maynard, Cooper & Gale, P.C., Montgomery, Andrew L. Frey and Evan M. Tager of Mayer, Brown & Platt, Washington, DC, for Amici Curiae the Chamber of Commerce of the United States and the Product Liability Advisory Council, Inc.
Jeff Sessions, Atty. Gen., and William H. Pryor, Jr., Deputy Atty. Gen., for Amicus Curiae the State of Alabama.

On Applications for Rehearing
SHORES, Justice.
The opinion released November 17, 1995, is withdrawn and the following is substituted therefor. The Court wishes to express its appreciation to counsel for the parties and to counsel for amici curiae for the excellent briefs filed in support of the applications for rehearing. The Court has been aided and persuaded by the excellent and well-reasoned arguments advanced by both the parties and the amici curiae.
Daisey L. Johnson sued Life Insurance Company of Georgia ("Life of Georgia"), alleging that it had engaged in intentional and reckless fraud and fraudulent suppression by selling her a Medicare supplement insurance policy that was worthless to her because she was eligible for Medicaid. The jury returned a verdict in favor of Ms. Johnson, assessing compensatory damages at $250,000 and punitive damages at $15 million. Life of Georgia moved for a new trial or for a remittitur of damages. The trial judge held a hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). Following the hearing, the trial judge reduced the punitive damages award to $12.5 million, pursuant to Ala.Code 1975, § 6-11-21, and this remittitur was accepted by the plaintiff. Life of Georgia appeals.
Ms. Johnson, a resident of Grove Hill, Alabama, is an 84-year-old woman who went through the third grade in school and who spent her life as a domestic worker. Because Ms. Johnson had dealt with Life of Georgia for over 25 years, paying premiums on nine different policies, she trusted its agents. Sometime before January 8, 1990, a Life of Georgia agent, Barbara Holt, came to Ms. Johnson's home to collect the monthly premiums on her existing policies. Ms. Holt recommended that Ms. Johnson purchase a Medicare supplement policy. The next week Ms. Holt returned and again discussed the Medicare supplement policy with Ms. Johnson, who agreed to purchase the policy. Ms. Johnson testified that Ms. Holt told her that the Medicare supplement policy would protect her. She testified: "If I got in the hospital, you wouldn't have to worry about your doctor bill, you could stay in there because they would pay your doctor bill, and I got it." Ms. Holt filled out the application for Ms. Johnson.
*688 At first, Barbara Holt testified that she asked Ms. Johnson for her Social Security card; later, she testified that she asked Ms. Johnson for her Medicaid card and that she asked the questions on the application, one of which was whether Ms. Johnson was on Medicaid. At trial, Ms. Johnson disputed Ms. Holt's testimony that she was asked whether she was on Medicaid. Ms. Johnson showed the jury how she gave her cards to Ms. Holt, by pulling a vinyl holder out of her purse. She testified that she always kept her cards in this vinyl holder, which contained her Medicaid, Medicare, and Social Security cards.
Despite the fact that Ms. Holt knew that it was illegal and against company policy to sell a Medicare supplement policy to Ms. Johnson, because she was on Medicaid, Ms. Holt completed the application and collected the premiums on the policy. Initially the premiums were $71 per month; by 1992, they had risen to $103almost one-third of Ms. Johnson's fixed income. Over almost a three-year period from 1990 through 1992, Ms. Johnson paid a total of $3,132 in premiums on this policy.
Life of Georgia first argues that it was entitled to a directed verdict or to a judgment notwithstanding the verdict, with respect to the award of punitive damages because, it argues, the plaintiff failed to prove by clear and convincing evidence that the company "consciously or deliberately engaged in oppression, fraud, wantonness, or malice" as is required by § 6-11-20, Ala. Code 1975, for the award of punitive damages. The statute provides:
"§ 6-11-20. Punitive damages not to be awarded other than where clear and convincing evidence proven; definitions.
"(a) Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Nothing contained in this article is to be construed as creating any claim for punitive damages which is not now present under the law of the State of Alabama.
"(b) As used in this article, the following definitions shall apply:
"(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"(2) Malice. The intentional doing of a wrongful act without just cause or excuse, either:
"a. With an intent to injure the person or property of another person or entity, or
"b. Under such circumstances that the law will imply an evil intent.
"(3) Wantonness. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
"(4) Clear and convincing evidence. Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.
". . . ."
The standard of review applicable to a directed verdict or to a denial of a motion for a directed verdict is whether the nonmoving party presented substantial evidence in support of his or her position. If not, then a directed verdict is proper. Bailey v. Avera, 560 So.2d 1038, 1039 (Ala.1990). A verdict is properly directed only where there is a complete absence of proof on a material issue or where there are no disputed questions of fact for the jury to determine. Woodruff v. Johnson, 560 So.2d 1040, 1041 (Ala.1990); K.S. v. Carr, 618 So.2d 707, *689 713 (Ala.1993). Life of Georgia argues strenuously that the evidence was not sufficient to meet this clear and convincing standard; however, it admits that the evidence was in sharp conflict.
The trial judge denied Life of Georgia's motion for a directed verdict because he was satisfied that the plaintiff had presented a jury question with regard to the issue of punitive damages. He stated in his Hammond order:
"Clear and convincing evidence was presented at trial that Life of Georgia was aware of the fraudulent sale of these Medicare supplement policies.... Plaintiff further produced clear and convincing evidence through the testimony of three live pattern witnesses that Life of Georgia's conduct in selling these policies to elderly, uneducated, single black women was not an isolated event and had not ceased and these people were paying a very substantial portion of their fixed income for useless policies. Evidence was presented at trial that Life of Georgia was aware of the unfitness of its agent in selling this specialized type policy. Eric Peek testified that he trained Barbara Holt for Life of Georgia yet gave her no training relative to the Medicare Supplement policies because he himself did not receive training to enable him to understand and properly sell these policies. Evidence was presented at trial that Life of Georgia began marketing the Medicare supplement policies in 1986 and that continuing through the date of the verdict in June of 1994, Life of Georgia had done nothing to ferret out and correct the problem. In fact, Life of Georgia's corporate officers testified during the Plaintiff's presentation of her case that Life of Georgia had done nothing to try to prevent the sale of Medicare supplement policies to unqualified persons, even though in 1992 Life of Georgia had been faced with trial in Mobile County and experienced an adverse verdict...."
The trial judge then instructed the jury that, pursuant to § 6-1-20, it must be satisfied by "clear and convincing evidence" of the plaintiff's allegations before it could return a punitive damages award. In the Hammond order, the trial judge recited the proof presented by the plaintiff as to her dealings with agent Barbara Holt in regard to the Medicare supplement policy:
"Plaintiff proved that Life of Georgia's agent, Barbara Holt, misrepresented to her that she needed health insurance under a Medicare supplement policy in order to pay her hospital and medical bills should she become sick. There was ample and substantial evidence that Plaintiff showed Barbara Holt her Medicaid card and that Barbara Holt knew or should have known that Plaintiff did not qualify for the insurance since she was a Medicaid recipient. Plaintiff proved that Barbara Holt was not properly trained to be aware of circumstances where elderly persons living on low fixed income such as Daisey Johnson have coverage under both Medicare and Medicaid. This lack of awareness permeated Life of Georgia's entire corporate structure as the vice president in charge of marketing and training, Robert Hayes, gave uncontradicted testimony that he too would `assume' that if someone was on Medicare they did not have Medicaid. Plaintiff proved that over 116,000 Alabamians have both Medicare and Medicaid. This lack of training and awareness fostered both intentional and reckless misconduct on behalf of its agents, including Barbara Holt. Plaintiff discovered, after hearing about a similar situation involving Mattie Foster and Life of Georgia, that she had been sold a Medicare supplement policy she did not need and was useless to her. Plaintiff's proof that Life of Georgia was aware of the situation where unqualified elderly people living on fixed income were sold this Medicare supplement policy yet did nothing to prevent or detect such wrongful conduct distinguishes this case from `renegade agent' cases. Life of Georgia played an active role in allowing Barbara Holt to sell the policy in question and continue to collect the premiums."
When the evidence meets the "sufficiency" test, jury verdicts are presumed correct, and this presumption is strengthened by the trial court's denial of a motion for new trial. Therefore, a judgment based *690 upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial will not be reversed on the ground that it is against the weight of the evidence, unless it is plainly and palpably wrong. Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162 (Ala.1988); Ashbee v. Brock, 510 So.2d 214 (Ala.1987); Jawad v. Granade, 497 So.2d 471 (Ala.1986). Having carefully studied the lengthy record, we conclude that there was substantial evidence before the jury to support the plaintiff's claim.
Life of Georgia next contends that the trial court erred in admitting what it calls "highly improper, prejudicial and inflammatory evidence" with respect to the plaintiff's claim that Life of Georgia was negligent and wanton in its training of its agents. The company contends that the only reason the plaintiff pursued the negligent and wanton training claim was to introduce evidence that would prejudice and bias the jury against the company. This argument disregards the Alabama statute on vicarious liability, § 6-11-27, Ala.Code 1975, and the strong proof required under this statute. The common law rule of vicarious liability is modified by § 6-11-27; this Code section requires a higher degree of proof of culpability on the part of the principal before punitive damages can be imposed against the principal for the conduct of its agent. Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So.2d 384, 390 (Ala. 1993). This Court noted this modification in Sheridan and commented: "Thus, as a logical matter, if plaintiffs can meet the statutory requirement for vicarious liability, they will, in many cases, also have established the elements of their claims for wantonness in the hiring and supervision of the agent." Id. The plaintiff's evidence relating to her claim that Life of Georgia negligently and wantonly trained its agents was directly related to her fraud claim. Because the plaintiff was required to prove a higher degree of culpability on the part of Life of Georgia to bind it for the acts of its agent, the trial court did not err in admitting this evidence. Id.
Next, Life of Georgia argues that it is entitled to a remittitur of the $250,000 compensatory award, on the grounds that the award grossly exceeds the plaintiff's "mental anguish" damages and her $3,132 out-of-pocket loss. Life of Georgia contends that the only evidence presented by the plaintiff concerning her mental state, upon learning that the insurance policy she had paid on for almost three years was worthless, was "that it made her angry" and that it "worried" her. The record reflects that this is not an accurate picture of her testimony. Ms. Johnson testified that after she learned that she had been paying the premiums on a worthless insurance policy, she could not sleep and her meal schedule was disrupted. Her testimony that she ran two insurance agents off her property, telling them "to leaveleave out of my yard and don't come back" is evidence from which the jury could conclude that Ms. Johnson was distressed to learn that she had been paying for a worthless policy and that she had suffered mental anguish as a result. The jury listened to her evidence and concluded that she had suffered emotionally as a result of the company's conduct. "[T]here [is no] yardstick to measure the amount of recompense which should be awarded for ... mental suffering." Birmingham Electric Co. v. Thompson, 251 Ala. 465, 466, 37 So.2d 633, 634 (1948).
The trial judge also reviewed the evidence presented by the plaintiff concerning her claim for mental anguish. He concluded: "Ample evidence was presented at trial which supports the total compensatory damages award of $250,000 against Life of Georgia." This Court has said that the trial judge has much discretion in determining whether to grant a new trial and whether to require a remittitur of damages for mental anguish. Crown Life Ins. Co. v. Smith, 657 So.2d 821 (Ala.1994); Fields v. Parker, 361 So.2d 356 (Ala.1978). We find no abuse of discretion on his part in denying the motion for a new trial and in refusing to remit the award for compensatory damages, based upon the evidence before him. Pitt v. Century II, Inc., 631 So.2d 235, 239 (Ala.1993).
Finally, we come to the question of the imposition of punitive damages. Life of Georgia, a tortfeasor that has been found by this jury to be guilty of conduct for which the law permits the imposition of punitive damages, argues that its rights have been unconstitutionally *691 impinged upon by the imposition of such damages. Over the years the constitutional arguments advanced in efforts to eliminate or to cap punitive damages awards have taken different forms. It has been argued that the "excessive fines" provisions of the State and Federal Constitutions forbid the imposition of punitive damages. Kumar v. Lewis, 561 So.2d 1082 (Ala.1990); Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1988); Alabama Power Co v. Turner, 575 So.2d 551 (Ala. 1991), cert. denied, 500 U.S. 953, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991). As it relates to the Eighth Amendment, this argument was rejected by the United States Supreme Court in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), and this argument now has largely been abandoned. See Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). More recently, the due process provisions of the Fourteenth Amendment have been the basis of constitutional challenges where, as in this case, the defendant argues that the award of punitive damages is grossly excessive and fundamentally unfair and therefore contravenes Alabama law and the Due Process Clause of the Fourteenth Amendment. See Intercontinental Life Ins. Co. v. Lindblom, 571 So.2d 1092 (Ala.1990) vacated. It is also frequently argued that, under Alabama law, juries are provided too few standards for determining a verdict appropriate both to punish the defendant, whose conduct inflicted harm upon the victim, and to deter others from engaging in similar conduct, without completely destroying the defendant financially. Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986).
These arguments have been carefully considered by this Court. The standards set forth in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), were adopted partly in response to these concerns. These cases require the trial court, after the jury returns a verdict that the defendant claims to be excessive, to consider all relevant factors bearing on the issue of excessiveness when viewed from the perspective of the defendant. The factors set out in Hammond and Green Oil are not intended to be all-inclusive. Trial judges are encouraged to consider any evidence that has any relevance to the question of the fairness and justness of the jury verdict.
In this case, a jury found that Life of Georgia had defrauded an elderly Alabama citizen, and there was evidence that she was not the only Alabama victim of such fraud. The evidence established, and a jury has found, that the conduct of Life of Georgia justifies requiring it to pay a substantial sum of money as punitive damages. The trial judge has considered evidence offered in a post-verdict hearing pursuant to Hammond and Green Oil. After that hearing, the trial judge ordered a remittitur and explained his order, remitting the $15 million punitive damages award to $12.5 million, as follows:
"This Court is mindful that this verdict is large. Yet this Court finds that a punitive damages award of $12,500,000 bears a reasonable relationship to the harm that is likely to occur from Life of Georgia's conduct as well as to the harm that actually has occurred. The harm which was committed is even more egregious because Life of Georgia refuses to admit or concede any wrongdoing whatsoever and merely [attributes] the sale of this policy [to] a `miscommunication.' Life of Georgia has profited from such `miscommunications.'
"This Court finds that the economic impact of the verdict on Defendant Life of Georgia is slight. In 1993, the company had assets exceeding $2.3 billion. Investment income alone totaled $173 million for 1993 and the company has over $1.1 billion in reserve. The company has testified that it has sufficient resources to pay the judgment if it should be affirmed. The financial position of Life of Georgia does not support any reduction in this verdict.
"The Court finds that the verdict should be high in order to encourage a plaintiff such as this, and her attorneys, to pursue this type of case. The Court is of the opinion that there are many people situated such as Plaintiff who are unable due to sickness, age, infirmity or whatever to pursue *692 such a case. The Court has considered whether the cost of this litigation favors remittitur and is of the opinion that this factor does not weigh in favor of reducing this verdict.
"The Court has compared this verdict to other verdicts affirmed by the Alabama Supreme Court, including Northwestern Mutual Life Insurance Co. v. Sheridan, [630 So.2d 384 (Ala.1993)]. The Court is mindful that the $15 million punitive award is $2,500,000.00 larger than that amount affirmed in Sheridan, which is the largest punitive damages award in a fraud case ever affirmed by our Supreme Court. The Court has compared the facts of the Sheridan case, as set forth in the Supreme Court's opinion, and the facts of this case. The Court is clearly convinced that the wrongful conduct in this case is much worse. The class of plaintiffs Life of Georgia preyed upon were from a group of citizens that need the most protection: elderly, uneducated, and low income. Life of Georgia knew that these types of individuals were easily persuaded, and used sales techniques such as `fear' to sell these policies. The Court further compared this verdict to other verdicts similar in nature. Nevertheless, although this Court is of the opinion that the facts in this case are much worse than those in the Sheridan case, the Court is of the opinion that the punitive award in this case should be reduced by $2.5 million so as to not exceed the largest punitive award affirmed by our Supreme Court.
"Next, the president of Life of Georgia testified that Life of Georgia ceased doing business in Alabama and would never return. He also testified that if any policyholder of Life of Georgia had been sold a Medicare supplement policy who had received Medicaid benefits, that person's premiums would be immediately refunded. He further stated that Life of Georgia had undertaken a program in Alabama to determine whether there were any policyholders situated such as Daisey Johnson. However, the Court is aware that following the testimony of Life of Georgia's president, a witness testified by deposition for Plaintiff that her 91-year-old father was on Medicaid, had been sold a Medicare supplement policy, and that she had demanded Life of Georgia to return his premiums. Ms. Pernell, the daughter of the person sold the Medicare supplement policy, was informed by Life of Georgia that they would not refund the premiums. This testimony contradicts that of the president and concerns the Court as to the quality of Life of Georgia's assertion that it would refund premiums once an unqualified policyholder came forward.
"It is the conclusion of this Court that the verdict was not based upon bias, passion, prejudice, corruption, or other improper motive, but instead was the product of the jury's careful and studious consideration of the evidence and applicable law. This conclusion is based in part on this Court's observing ... all of the parties to the trial, the respective attorneys, and the jury and its reaction to all of the others. The jury was justified in awarding these damages to punish Life of Georgia and to prevent similar wrongs in the future. The imposition of these damages in this case creates a strong incentive for vigilance on the part of all insurance companies doing business in this state. The jury arrived at an amount that it considered necessary to vindicate the public interest by eliminating the reprehensible conduct of this defendant and in punishing it appropriately. This verdict is not so large that it goes beyond an amount necessary to accomplish these goals. This verdict will have little, if any, impact upon Life of Georgia and other insurance companies unless it is substantial...."
The trial judge's order demonstrates that he focused on the conduct of Life of Georgia to determine whether the punishment was excessive in relationship to that conduct. The trial judge also considered the public policy upon which punitive damages are based: to eradicate intentional conduct by the particular defendant before the court and to deter others from similar conduct. The trial court remitted the award to an amount that it determined, from an examination of the facts specific to the defendant, was not excessive; the court determined that the reduced *693 award is not so large as to destroy the defendant, but is large enough to serve the public policy of punishment and deterrence.
Alabama citizens who become the victims of fraud have little recourse other than through litigation. The record in this case is replete with expert testimony to the effect that the State Insurance Department has little power to regulate agents, and we judicially know that litigation is often the only weapon defrauded citizens have. Punitive damages have historically been part of the remedy for such victims, and to get that remedy they must prove that the defendant intentionally inflicted the injury for which punishment is sought. As Jonathan Massey, writing recently in Trial magazine, explained, punitive damages have been used "to help equalize the playing field between the powerful and the powerlesswhether between king and subject, railroad and passenger, or corporation and consumer." "Why Tradition Supports Punitive Damages: and How the Defense Bar Misreads History," Trial, September 1995 p. 19. Massey continues:
"Punitive damages awards in consumer fraud and products liability cases are within the historical tradition of tort law for an even more fundamental reason: Punitive damages have traditionally been used as a populist weapon to help level the playing field between powerless plaintiffs and powerful defendants. As the U.S. Supreme Court observed in an 1886 case,
"`The dignity and value of the right assailed, and the power and authority of the source from which the assault proceeds, are elements to be considered in the computation of damages, if they are to be not only compensation for the direct loss inflicted, but a remedy and prevention for the greater wrong and injury involved in the apprehension of its repetition. [Barry v. Edmunds, 116 U.S. 550, 566, 6 S.Ct. 501, 510, 29 L.Ed. 729 (emphasis added)].'
"In common law England, punitive damages were often employed against the crown and the aristocracy. In 19th-century America, they were frequently used against railroads and robber barons. As the Pennsylvania Supreme Court observed in 1886, `The liability of railway and other corporations to exemplary damages for gross negligence is well settled.' [Lake Shore & Michigan S. Ry. v. Rosenzweig, 113 Pa. 519, 544, 6 A. 545 (1886)].
"The modern-day heir of this populist legacy is the consumer plaintiff suing a large corporate defendant. Using punitive damages to redress the imbalance in the relationship between consumer and corporation is squarely within their historical tradition."
Id. at pp. 24-27.
Attorneys who represent victims of fraud, such as the fraud practiced upon this plaintiff, usually bear all of the expense of the litigation and carry all of the risk of failure. They are reimbursed only if the victim recovers from the wrongdoer. The lawyer takes a significant risk in such cases. According to Business Week magazine,[1] plaintiffs today are losing a greater proportion of cases that go to trial than in past years; in 1988 plaintiffs won 63% of the cases that went to trial, but in 1992 plaintiffs won only 54%. This Business Week statistic is supported by a United States Justice Department Survey[2] of the country's 75 most populous counties, which concluded that in 1992 only 2% of the 762,000 civil cases disposed of in those counties were decided by juries, and that plaintiffs won in only 52% of those cases.[3]
American Bar Association statistics show that personal injury claims represent only 9% of the civil caseload in this country. Since 1986, personal injury cases have remained essentially flat on the scale, while *694 domestic relations matters have increased by 43%.[4]
There are also many cases that are concluded by the entry of a summary judgment for the defendant. Cases decided by summary judgments formed the largest category of civil cases decided by this Court in 1994, 47.6%. Eighty-three percent of those cases were affirmed by this Court, either in whole or in part. In those cases in which the plaintiff's lawyer works on a contingency fee basis, the lawyer loses the amount she or he has expended in filing the action and in preparing for trial.
Litigation is slow and costly and carries no guarantee of success. Victims of fraud bear the burden of proving to the satisfaction of a jury of 12 citizens that they have been victimized by the defendant. It is a heavy burden, and litigation is an inefficient way to stop fraudulent conductone lawsuit at a time, brought by one victim at a timebut it provides the only recourse a defrauded citizen of Alabama has.
The question whether setting standards for post-trial review of a jury's verdict is sufficient to provide due process, while allowing the jury discretion to determine punitive damages, has been much discussed. Under our present procedure, the jury, before rendering its verdict, never hears whether the amount it selects as the appropriate amount for punishing the defendant and deterring others from similar conduct is actually an appropriate amount, considering the factors that trial courts and appellate courts must consider in reviewing jury verdicts (i.e., the Hammond and Green Oil factors). In some cases, the plaintiff or defendant may offer evidence that the acts complained of resulted in profit to the defendant in a specific amount. In some cases the evidence might show how much or how little it would have cost the defendant to remedy a defect in a product or to change its method of doing business, but, in most cases, it could be argued that the jury has incomplete information from which to determine with certainty the amount that is appropriate to serve the ends for which punitive damages were intended. Under our present procedure, much evidence relevant to reaching a decision as to an appropriate amount to punish the particular defendant is withheld from the jury. To reach a verdict and to fix an amount of punitive damages, the jury may consider only the character of the defendant's conduct and the degree of wrong as shown by the evidence in the case. These strictures on the evidence that the jury may consider in awarding punitive damages result from concern that evidence of the defendant's wealth or the defendant's lack of wealth and other evidence that is relevant, if not critical, to the issue the jury is asked to decide must be excluded because such evidence could potentially influence the jury to the prejudice of one party or another. We have concluded, after much deliberation, that the need for more guidance for the jury in these cases outweighs the concern that such evidence might prejudice the jury. Juries are presumed to follow the law as instructed by the trial court. There is no reason to assume that the jury would disregard the trial court's instructions on this issue.
Separating the fact-finding process for adjudging liability and compensatory damages from the damages-assessment process in a punitive damages case and, at the same time, improving the reliability of the punitive damages-assessment process is a procedural goal that was recognized by Justice Jones in his special concurrence in Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala. 1981), as adopted by this Court in Green Oil Co. v. Hornsby, supra. Justice Houston, concurring specially in Charter Hosp. of Mobile, Inc. v. Weinberg, 558 So.2d 909 (Ala. 1990), expressed his opinion that constitutional due process provisions are violated when the jury is "given the unbridled discretion to award no punitive damages or to award an unlimited amount of punitive damages, taking into consideration only the character and the degree of the wrong as shown by the evidence in the case and the necessity of preventing similar wrongs in the *695 future." 558 So.2d at 917. Justice Houston then set out a procedure providing for a bifurcated trial as a way to ensure due process:
"Therefore, I would recommend that the following procedure be applied in all jury cases involving claims for punitive damages and as to which claims a party had a right to trial by jury at common law prior to the adoption of the first Alabama Constitution....
"A jury will determine the issues of liability, the amount of compensatory damages, and whether the defendant's conduct warrants the imposition of punitive damages. In addition to other jury verdict forms, in common law cases involving punitive damages the following jury verdict form should be given to a jury for each party against whom punitive damages are sought:
"`In accordance with the instructions given to us by the trial court, we find that punitive damages (should) (should not) be assessed against (name of party against whom punitive damages are sought).'
"In the event that the jury determines that punitive damages should be imposed against one or more defendants, the trial will resume; and evidence of the following, which was not admissible in the trial in chief, shall be admissible upon an offer by any party in accordance with the rules of evidence.*
"Evidence of the harm that was likely to occur from the defendant's conduct as well as the harm that actually has occurred is relevant. The jury should be instructed that, if it finds that the actual and likely harm is slight, the punitive damages (subject to the other factors hereinafter set out) should be relatively small. If the actual harm and/or likely harm was grievous, the punitive damages (subject to the other factors hereinafter set out) should be much greater.
"The duration of the defendant's conduct, the degree of the defendant's awareness of any hazard that his conduct has caused or is likely to cause, any concealment or `cover-up' of that hazard, and the existence and frequency of similar conduct of the defendant are relevant. The jury should be instructed that if it finds that the defendant's offensive conduct was of long duration or was frequently repeated; that the defendant acted with awareness that his conduct was causing or was likely to cause the hazard by which the plaintiff was in fact damaged; or that the defendant concealed or covered up that hazard, then such a finding should increase the amount of punitive damages.
"The profitability of the conduct to the defendant is relevant. The jury should be instructed that the punitive damages should remove all profit from the wrongful conduct and should be in excess of the profit, so that the damages would `sting.'
"The financial position of the defendant is relevant. The jury should be instructed that the amount of punitive damages should `sting' the defendant, considering his financial condition.
"All costs of the litigation, including the attorney fees to be paid to the plaintiff's attorney, are relevant; and the jury should be instructed that its award should include all reasonable costs of litigation, so as to encourage injured parties to bring wrongdoers to trial.
"If criminal sanctions have been imposed on the defendant for his conduct, this is relevant; and the jury should be instructed that such criminal sanctions should be taken into account in mitigation of the punitive damages award.
"If there have been other civil actions against the defendant based on the same conduct and if punitive damages have been assessed against the defendant in those civil actions, this is relevant; and the jury should be instructed that it should consider this in mitigation of the punitive damages award.
"I believe that, if these factors are considered by a jury in assessing the amount of punitive damages a defendant should pay, this will improve the reliability of the punitive damages assessment process and will fit the punishment to the offensive conduct of the offender. I believe that by doing this in a bifurcated trial the court *696 could preserve the reliability of the factfinding process for adjudging liability, thereby accomplishing the goal we set in Green Oil Co. v. Hornsby, supra, when we adopted Justice Jones's special concurrence in Ridout's-Brown Service, Inc. v. Holloway, [397 So.2d 125, 127-28 (Ala. 1981)].
"* A bifurcated trial is also recommended by the American College of Trial Lawyers, `Report on Punitive Damages of the Committee on Special Problems in the Administration of Justice' (March 3, 1989), pp. 18-19."
558 So.2d at 917-18.

I. Bifurcation
We hold that after the new procedures announced in this case become effective in all cases in which punitive damages are sought, excluding all actions based upon wrongful death, the trial shall be bifurcated in accordance with the procedure set out in Justice Houston's special concurrence in Charter Hospital of Mobile v. Weinberg, supra. The trial court shall charge the jury on the appropriate law, and the jury shall determine liability and the amount of compensatory damages, if any. The jury will also decide, by special verdict, whether the evidence justifies the imposition of punitive damages. In order to get an award of punitive damages, the plaintiff must prove a prima facie case of conduct supporting an award of punitive damages and the jury's decision to award punitive damages must be based upon clear and convincing evidence. If the jury returns the special verdict in the affirmative, the trial shall resume for the second part of the bifurcated trial.
In the second part, all evidence shall be admitted that is relevant to the question of what amount would be appropriate, to accomplish the purposes punitive damages were designed to serve, and it shall be admitted in accordance with § 6-11-23(b), Ala.Code 1975, which provides:
"(b) In all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages. Any relevant evidence, including but not limited to the economic impact of the verdict on the defendant or the plaintiff, the amount of compensatory damages awarded, whether or not the defendant has been guilty of the same or similar acts in the past, the nature and the extent of any effort the defendant made to remedy the wrong and the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of shall be admissible; however, such information shall not be subject to discovery, unless otherwise discoverable, until after a verdict for punitive damages has been rendered...."
All evidence that has heretofore been admissible at post-verdict Hammond/Green Oil hearings can be introduced under this new procedure, before the jury retires to consider its punitive damages verdict.
The jury is to be guided not only by the factors set forth in Hammond and Green Oil, but also by those factors stated in the statute and in other case law. Davis Carr, writing in the Alabama Lawyer, has offered the following compilation of factors, drawn from both case law and statute, that can be considered:
"From the statute [§ 6-11-23, Ala.Code 1975 (Supp.1989)]:
"1. Nature, extent and `economic impact' of verdict on plaintiff or defendant.
"2. Amount of compensatory damages.
"3. Whether defendant has been guilty of similar acts in the past.
"4. The nature and extent of any effort by defendant to remedy the wrong.
"From Green Oil:

"1. Does the punitive damages award bear a reasonable relationship to the harm likely to occur from the defendant's conduct?
"2. The degree of reprehensibility of defendant's conduct, including:
"(a) the duration of this conduct;
"(b) the degree of defendant's awareness of any hazard which this conduct has caused or is likely to cause;
"(c) any concealment or cover-up of the hazard;

*697 "(d) existence and frequency of similar past conduct.
"3. Punitive damages should remove the profit, if any, from the defendant and should be in excess of the profit so that defendant recognizes a loss.
"4. Defendant's `financial position.'
"5. Cost of litigation to the plaintiff.
"6. If defendant has received criminal sanctions, that should be taken into account in mitigation.
"7. If there have been other civil actions against the same defendant based on the same conduct, this should be taken into account in mitigation of the punitive damages.
"From Hammond:

"1. Culpability of defendant's conduct.
"2. The desirability of discouraging others.
"3. `The impact' on the parties.
"4. `Impact' on innocent third parties.
"From Holloway [Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125, 127 (Ala. 1981)]:
"The punitive damages award should sting, but ordinarily it should not destroy.
"From Wilson [v. Dukona Corp., N.V., 547 So.2d 70 at 73 (Ala.1989)]:
"Defendant's `right to fair punishment' must be considered above plaintiff's right to recover the fullest amount of punitive damages.
"From Lavoie [Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 at 1053 (Ala.1987)]:
"`A comparative analysis with other awards in similar cases.'"[5]
We agree with the parties and amici curiae that the fact of the existence of liability insurance and the amount thereof cannot be disclosed to the jury. In addition, the discovery of financial information concerning the defendant will be limited to that which is relevant to the issue in the case. How much the defendant profited as a result of the tortious conduct would be relevant, as would, in many cases, how much it would have cost the defendant to avoid the tortious conduct. The net worth of the defendant may or may not be relevant, depending upon the nature of the case. In no event, however, is the defendant to be punished for its size or its success, only for its tortious conduct. This new procedure is intended to allow the jury to decide, based upon all the evidence that is relevant to that inquiry, the award that the specific defendant before the jury should be required to pay as punishment for the specific conduct justifying the punitive award.
The adoption of this bifurcated procedure is not a substitute for post-trial procedures for reviewing punitive damages awards. These awards, when challenged as excessive or inadequate, still must be considered through the procedures set out in Green Oil Co. v. Hornsby, supra, and Hammond v. City of Gadsden, supra. However, the evidence need not be readmitted in any post-verdict hearing on the question of excessiveness. Only such evidence as was not available for consideration by the jury that bears on the issue of excessiveness will be admitted in a post-verdict hearing on excessiveness. The trial courts must continue to review jury verdicts not only for excessiveness, but also to determine the validity of other challenges to jury verdicts. After this procedure is put in place, it can no longer be said that juries are left with no guidance in determining an appropriate punitive award.

II. Allocation
Much of the criticism surrounding the issue of punitive damages has been based on the perception that punitive damages awards sometimes amount to undeserved windfalls to the prevailing plaintiffs. Chief Justice Rehnquist has suggested that the windfall effect could be avoided by requiring the losing defendant to pay the punitive award "to the *698 State, not to the plaintiffwho by hypothesis is fully compensated." Smith v. Wade, 461 U.S. 30, 59, 103 S.Ct. 1625, 1641, 75 L.Ed.2d 632 (1983) (Rehnquist, C.J., dissenting). Such broad power to shape and effectuate remedies is deeply rooted in the common law system. Eisenberg and Yeazell, The Ordinary and the Extraordinary in Institutional Litigation, 93 Harv.L.Rev. 465 (1980); Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281 (1976).
Some states have passed statutes that allocate punitive damages and require that a portion of each punitive damages award be paid to the state general fund or some special fund that serves a public purpose. Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878, 887 (Ala.1991). For example, Illinois[6] and Iowa[7] allocate punitive damages pursuant to statute. Florida[8] and Colorado[9] passed such statutes in 1987; these were both repealed, effective 1995.
A special concurrence in Preferred Risk, 577 So.2d at 886, suggested that if a court concludes that the amount of punitive damages awarded is not so large as to deprive the defendant of property in contravention of § 13 of the Alabama Constitution of 1901 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, then the court, nevertheless, may also determine that it would be in the best interest of justice to require the plaintiff to accept less than all of the amount and to devote a part of the amount to such purposes as the court may determine would best serve the goals for which punitive damages are allowed in the first place: vindication of the public interest and deterrence to the defendant and to others who might commit similar wrongs in the future. This viewpoint was again expressed by three Justices in Smith v. States General Life Ins. Co., 592 So.2d 1021, 1025 (Ala.1992), and in special concurrences in Principal Financial Group v. Thomas, 585 So.2d 816, 819 (Ala.1991) (with Shores, Houston, and Steagall, JJ., joining), cert. denied, 502 U.S. 1009, 112 S.Ct. 649, 116 L.Ed.2d 666 (1991); Southern Life & Health Ins. Co. v. Turner, 586 So.2d 854, 859 (Ala.1991); Union Mortgage Co. v. Barlow, 595 So.2d 1335, 1348 (Ala.), cert. denied, 506 U.S. 906, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992); BMW of North America, Inc. v. Gore, 646 So.2d 619, 629 (Ala.1994).
In a special concurrence in BMW of North America, Inc. v. Gore, supra, a Justice views a procedure that directs a substantial portion of punitive damages awards to the state general fund or some special fund that serves a public purpose as a means of both avoiding the windfall effect and strengthening the jury system:
"In the name of all that is fair, I ask this Court, which has consistently held that plaintiffs have no right to punitive damages, to direct that all or a substantial portion of punitive damages awarded in civil cases, after deducting attorney fees and expenses of litigation, be paid to the state general fund or to some special fund that serves a public purpose or advances the cause of justice. If this is done, then the time-honored and constitutionally mandated right to trial by jury will not be perceived, insofar as punitive damages is concerned, as Alabama's lottery, as it is now perceived by so many."
646 So.2d at 631. We agree, and we now hold that a part of the punitive damages awarded in future cases (excluding cases based on wrongful death) shall be paid into the state general fund. It is appropriate and fair that some part of the civil fine imposed by juries in the form of punitive damages awards should be devoted to the general welfare of all the citizens of Alabama. We *699 believe that this practice will strengthen the public's confidence in our civil justice system because, under this procedure, wrongdoers can be appropriately discouraged from inflicting harm upon others without inappropriately rewarding the victim.
All punitive damages judgments (excluding all damages in actions based upon wrongful death) that are entered as a result of the new bifurcated procedure shall be allocated as follows: After any post-verdict review is concluded by the trial court, and after appellate review, if any, the amount of the judgment as finally determined shall be paid into the trial court. The trial court shall order all reasonable expenses of the litigation, including the plaintiff's attorney fees (as determined in accordance with any agreement between the plaintiff and the plaintiff's attorney), paid. The trial court shall then order the clerk of the court to divide the remaining amount equally between the plaintiff and the State general fund. The fact that the State may ultimately share in some part of a punitive damages award does not mean that the State has a vested interest in a private lawsuit seeking punitive damages. The State shall have no right to intervene or participate in such cases. The parties will continue to have full authority to settle cases without the participation or consent of the State, and court approval is not required. In the case of settlement, the parties need not designate any part of the settlement proceeds as punitive damages and no part of the settlement proceeds shall be paid into the general fund. In summary, the right of the parties to settle any lawsuit is unaffected by this opinion.

III. Judicial Review of Jury Verdicts in General
Under our system of government, with its guarantee of separation of powers between the executive, legislative, and judicial branches of government, it is peculiarly and exclusively the function of the judiciary to determine whether a jury award in a civil case exceeds the amount that the State and Federal Constitutions will allow without violating the due process rights guaranteed to all citizens of this State and this country. Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414, 419, 581 So.2d 414 (Ala.1991). The separation of powers provision, found in Article III, § 42, of the Alabama Constitution of 1901, provides:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive to another, and those which are judicial to another."
Section 43 reads:
"In the government of this state, except in the instances in this Constitution, hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
In Armstrong v. Roger's Outdoor Sports, we held certain statutes, which attempted to remove all presumption of correctness from a jury verdict and from a trial court's judgment, to be unconstitutional as a violation of the separation of powers provisions of the Alabama Constitution, Article III, §§ 42 and 43.[10]Armstrong, 581 So.2d at 421. In Armstrong v. Roger's Outdoor Sports we quoted with approval Cobb v. Malone, 92 Ala. 630, 9 So. 738 (1891):
"`The power to set aside verdicts has been generally regarded in this country as inherent in courts organized upon the principles of common law, though in some States it is regulated by statute, enumerating the grounds upon which a motion for a new trial may be made. The power is essential to prevent irreparable injustice in *700 cases where a verdict wholly wrong is the result of inadvertence, forgetfulness, or intentional or capricious disregard of the testimony, or of bias or prejudice, on the part of juries, which sometimes occurs....'"
581 So.2d at 419.
In two other cases, this Court had held that statutes enacted by the legislature violated the right-to-jury-trial provisions of the Alabama Constitution. In Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991), this Court held that § 6-5-544(b), Ala.Code 1975, which limited the amount of "noneconomic" damages recoverable in a medical malpractice action, violated the right to trial by jury as guaranteed by Article I, § 11, of the Alabama Constitution 1901. This section provides "[t]hat the right of trial by jury shall remain inviolate." Then, in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala. 1993), this Court held that a limitation on punitive damages, such as that imposed by § 6-11-21, clearly impairs the traditional function of the jury, thus violating the right to trial by jury guaranteed by Article I, § 11. In those cases, we said that, under an analysis of § 11, the pertinent question is not whether the right still exists under the statute, but whether it still remains inviolate. 627 So.2d at 885 (quoting Alford v. State, 170 Ala. 178, 197, 54 So. 213 (1910)). Because the majority was convinced that the statutes violated the right-to-jury-trial provision of the Alabama Constitution, it was not necessary in those cases to decide whether those statutes also violated the separation of powers provisions of the Alabama and United States Constitutions. However, it is arguable that these statutes did violate the separation of powers provisions.
Because, under the separation of powers provisions, it is the inherent and exclusive power of the judiciary to determine whether a jury award in a civil case exceeds the amount that the State and Federal Constitutions will allow without violating due process rights, the trial judge in this case, in a post-verdict Hammond hearing, considered the question whether the jury had followed its instructions on the law, as well as whether the verdict was the result of passion or bias in favor of, or against, either side in the litigation. After so doing, he ordered a remittitur of the $15 million award of punitive damages to $12.5 million.

IV. Appellate Review in this Case
We have independently reviewed the evidence in this case, applying the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989), cited in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and quoted in Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So.2d 384 (Ala.1993), including:
"`(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the `financial position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.' Haslip, 499 U.S. at 21-22, 111 S.Ct. at 1045."
Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So.2d at 393.
We conclude, as did the trial judge, that the conduct of this defendant was egregious and reprehensible and resulted in a great financial hardship to some of the most vulnerable members of our society. Life of Georgia fraudulently sold policies to people on Medicaid that were totally worthless to the victims of the fraud. Life of Georgia had no risk under these fraudulently sold policies. The practice was a sham and would never have been permitted in this state if the activities of insurance agents were properly regulated. However, as reprehensible as Life of Georgia's conduct was, it is not the most *701 odorous this Court has been required to review. Without in any way condoning the conduct, we nevertheless are compelled, when comparing this conduct with other acts perpetrated upon Alabama citizens, to reduce the award against the defendant Life of Georgia to $5 million.[11]Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). It is the opinion of this Court that $5 million is not excessive for punishment and deterrence specific to Life of Georgia, considering all of the facts of this case.

V. Prospective Application of the Procedures Announced in this Case
The new procedures announced in this case shall be applied in all cases in which punitive damages are sought (excluding all actions for wrongful death) which are filed more than 90 days after the certificate of judgment issues in this case. We are persuaded by the arguments of both parties that these new procedures, including allocation of part of the punitive damages award, should not be applied in this case or in any other case filed within 90 days after the issuance of the certificate of judgment in this case. Inevitably, the new procedures announced here will affect settlement negotiations, and they may, as suggested by some amici curiae, promote more settlements. These and other considerations convince us that these procedures should have prospective effect only. Accordingly, we hold that the procedures announced in this opinion shall be applied in all punitive damages cases (excluding wrongful death cases) filed more than 90 days after the certificate of judgment issues in this case.

Summary of Holdings

I. Bifurcation
The trial of all cases in which punitive damages are sought (excluding cases based upon wrongful death causes of action), that are filed more than 90 days after the certificate of judgment issues in this case, shall be bifurcated. The jury shall first determine liability and the amount of compensatory damages, if any. The plaintiff must prove a prima facie case of conduct supporting an award of punitive damages, and the jury's decision must be based upon clear and convincing evidence. If the jury finds against the defendant, it will also decide, by a special verdict, whether the evidence justifies the imposition of punitive damages. If the jury returns the special verdict in the affirmative, the trial shall resume.
In the second part of the trial, all evidence shall be admitted that is relevant to the question of what amount would be appropriate to accomplish the purposes punitive damages were designed to serve, and it shall be admitted in accordance with § 6-11-23(b), which provides:
"(b) In all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages. Any relevant evidence, including but not limited to the economic impact of the verdict on the defendant or the plaintiff, the amount of compensatory damages awarded, whether or not the defendant has been guilty of the same or similar acts in the past, the nature and the extent of any effort the defendant made to remedy the wrong and the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of shall be admissible; however, such information shall not be subject to discovery, unless otherwise discoverable, until after a verdict for punitive damages has been rendered...."
All evidence that has heretofore been admissible at post-verdict Hammond/Green Oil hearings, can be introduced under this new procedure, before the jury retires to consider its punitive damages verdict. However, the fact of the existence of liability insurance and *702 the amount thereof cannot be disclosed to the jury. In addition, the discovery of financial information concerning the defendant will be limited as provided in § 6-11-23(b) and shall be limited to information that is relevant to the issue in the case. The net worth of the defendant may or may not be relevant, depending upon the nature of the case. Again, we reiterate that a defendant is not to be punished for its size or its success; instead, it may be punished only for the tortious conduct proved in the trial of the case. This new procedure is intended to allow the jury to decide, based upon all the evidence that is relevant to that inquiry, the award that the specific defendant before the jury should be required to pay as punishment for the specific conduct made the basis of the action.
If the punitive damages verdict is challenged in a post-verdict motion as excessive or inadequate, it must still be considered by the trial judge through the procedures set out in Green Oil Co. v. Hornsby, supra, and Hammond v. City of Gadsden, supra.

II. Allocation
All punitive damages (excluding all damages in actions based upon wrongful death) awarded by judgments entered as a result of the new bifurcated procedure established by this opinion shall be allocated as follows: After any post-verdict review is concluded by the trial court, and after appellate review, if any, the amount of the judgment as finally determined shall be paid into the trial court. The trial court shall order all reasonable expenses of the litigation, including the plaintiff's attorney fees, paid. In doing so, the trial court will enforce any agreement between the plaintiff and counsel for the plaintiff as to attorney fees. The trial court shall then order the clerk of the court to divide the remaining amount equally between the plaintiff and the State general fund. The State shall have no vested right in any private lawsuit in which punitive damages are sought and shall not be permitted to intervene or participate in any way in the trial or settlement of such cases. Court approval is not required to settle such cases. In the case of settlement, the parties need not designate any part of the settlement as punitive damages, and no part of the settlement proceeds shall be paid into the general fund. In summary, the right of the parties to try and settle any lawsuit is unaffected by this opinion. Settlement of these cases, like all others, is encouraged.

III. Reduction of the Punitive Award
The award of $12.5 million in punitive damages is reduced to $5 million.

IV. Prospective Application
The new procedures announced in this case shall be applicable only to cases in which punitive damages are sought (excluding all actions based upon wrongful death) and only to cases that are filed more than 90 days after the certificate of judgment issues in this case.

Judgment
That portion of the judgment awarding compensatory damages is affirmed. The award of punitive damages is reduced to $5 million. If the plaintiff does not, within 28 days of the date of this opinion, file in this Court a remittitur of $7.5 million, then the defendant shall be granted a new trial.
APPLICATIONS GRANTED; OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED CONDITIONALLY.
ALMON, HOUSTON, KENNEDY, INGRAM, and COOK, JJ., concur.
HOOPER, C.J., concurs in the result in part and dissents in part.
MADDOX and BUTTS, JJ., concur in part and dissent in part.
HOOPER, Chief Justice (concurring in the result in part and dissenting in part):
I concur in the result as to parts II, III, and IV, as the result is stated in the "Summary of Holdings" portion of the opinion. See 684 So.2d at 701-702. Specifically: (1) I agree with the decision to allocate half of a punitive damages award to the State, because the plaintiff does not have a proprietary or any other interest in a punitive damages award, see City Bank of Alabama v. *703 Eskridge, 521 So.2d 931, 933 (Ala.1988); (2) I agree with the reduction of the punitive damages award from $12.5 million to $5 million; and (3) I agree with the procedures set out in part IV. I dissent from part I of the majority opinion because that holding violates the clear intent of the Legislature in Ala.Code 1975, § 6-11-23(b), and also changes a common law principle of 140 years' standing that had excluded evidence of a defendant's wealth or financial position from being considered by the jury.
Evidence of a defendant's wealth or financial standing has never been admissible in a jury trial. Southern Life & Health Ins. Co. v. Whitman, 358 So.2d 1025 (Ala.1978); and Ware v. Cartledge, 24 Ala. 622, 627 (1854). This principle was reinforced by the fact that the Hammond/Green Oil factors were never intended to be considered by the jury, but solely by the judge in considering whether a jury award was proper. Reserve National Ins. Co. v. Crowell, 614 So.2d 1005, 1009 (Ala.1993). Allowing evidence of a defendant's wealth into evidence brings the politics of resentment into the courtroom and encourages and legitimates the Robin Hood reaction.
In 1987, in the "Tort Reform Act," the Legislature adopted the common law rule excluding evidence of a defendant's financial position. Section 6-11-23(b) states: "[T]he trial court shall ... either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages." That section goes on to state that evidence of the economic impact of the verdict on the defendant "shall not be subject to discovery, unless otherwise discoverable, until after a verdict for punitive damages has been rendered" (emphasis added). The purpose of § 6-11-23(b) was to prevent the exposure of such evidence to a jury. The majority's holding on this point contravenes the clear intent of the Legislature by allowing a jury to consider evidence of a defendant's wealth.
The majority addresses the issue of "prejudice" by stating: "Juries are presumed to follow the law as instructed by the trial court. There is no reason to assume that the jury would disregard the trial court's instruction on this issue." 684 So.2d at 694. In other words, the majority appears to be saying that defendants should not be concerned about the danger of prejudice because the trial judge can always instruct the jury to disregard certain evidence after the fact or remedy the error in a jury's hearing any evidence that should not have been heard. This rationale could also support an argument in favor of abolishing all limiting rules of evidence and letting the jury hear any and all evidence, such as hearsay and opinions, regardless of its relevance, trustworthiness, or prejudicial content, because juries are presumed to listen to the trial judge's instructions, and those instructions may direct the jury to unring the bells that were rung by the parties. The majority's approach to evidence endangers the constitutional guarantee of a fair trial.
The foundation of western law is "equal justice under the law." "Ye shall do no unrighteousness in judgment: thou shalt not respect the person of the poor, nor honor the person of the mighty: but in righteousness shalt thou judge thy neighbor." Leviticus 19:15 (King James). The temptation of a jury to ignore this fundamental principle is the reason evidence of a "mighty" defendant's wealth is excluded from consideration by the jury.
I concur in the result as to parts II, III, and IV, but, for the foregoing reasons, I must dissent as to part I.
MADDOX, Justice (concurring in part; dissenting in part).
I concur in that portion of the majority opinion that affirms the judgment entered upon the jury verdict, conditioned upon the plaintiff's agreement to remit all but $5,000,000 of the punitive damages awarded.
I also concur in that portion of the opinion that adopts a procedure requiring a bifurcation of trials in cases in which claims for punitive damages are presented to a jury, but I must point out that this is a major procedural change, and I would have preferred that this Court follow the normal practice when adopting procedural changes. By following our usual procedures of giving notice to the bench and bar and other interested *704 parties of such a proposed change in our procedures, such interested persons would have had an opportunity to comment on the proposal before its adoption.
For at least three reasons, I cannot agree with the holding of this Court that establishes a procedure for the distribution of a portion of the punitive damages award to the State. First, I question the power of this Court to direct the payment of damages recovered in a civil case into the General Fund of the State; second, I believe that the Legislature is the proper branch of government to make policy determinations of this magnitude; and third, even if the Court has the power to adopt the procedure under its rulemaking power, I would not adopt the procedure without giving notice of the proposal to the parties, the bench and bar, and the public, so that each member of each group would have an opportunity to comment on the proposal.
Before I specifically address the reason for my vote, I offer this preface about the development of the law in this state relating to damages, especially punitive damages, that can be recovered for breach of a noncommercial contract of insurance. That law has dramatically changed over the past decade or so, and actions such as this one, in which a jury awarded $15,000,000 in punitive damages, have raised some serious policy questions, such as: What type of remedy should be employed when an insurer fails to pay a valid claim made by its insured? What is the measure of damages and to whom should they be paid? What is the proper role of the courts in reviewing jury awards that are claimed to be excessive? Can courts direct the distribution of a punitive damages award? In many of the past cases involving alleged breaches of insurance policies, I had to dissent. I specifically disagreed when the Court selectively struck down most of the so-called "Tort Reform" legislation that was adopted to address some of these issues.
Much of the history of the development of the law that allows juries to assess punitive damages against an insurer is contained in a dissenting opinion I filed in Continental Assur. Co. v. Kountz, 461 So.2d 802, 810 (Ala. 1984) (Maddox, J., dissenting), wherein I discussed the development of the tort of bad faith and why I thought that either this Court or the Legislature should provide an alternative to the tort of bad faith failure to pay a noncommercial insurance claim, by permitting the recovery of attorney fees and consequential damages when a policyholder was forced to go to court to establish entitlement to insurance benefits.[12]
In the following sections of this opinion, I will specifically state the reasons why I concur in part and why I must also respectfully dissent in part.

I.
First, I will discuss why I concur in that portion of the opinion that conditionally affirms the judgment and orders a remittitur.
Jury awards of punitive damages in Alabama have dramatically increased in Alabama in the last 15 years. See Appendix A, which was included as an appendix to Life of Georgia's brief in this case, and which purports to be based on published reports of cases from Alabama.[13] The substantial amount of those jury awards in Alabama has caused defendants to ask this Court to review the awards and to either grant a new trial or order a remittitur. Many defendants have claimed that the awards of punitive damages by Alabama juries violate their federal constitutional rights and some have appealed these awards to the United States Supreme Court. See, e.g., Aetna v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 *705 (1986); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994), cert. granted, ___ U.S. ___, 115 S.Ct. 932, 130 L.Ed.2d 879 (1995).
The jury award of $15,000,000 is obviously excessive, and the reduction of the judgment to $5,000,000 by this Court still imposes a substantial penalty on the defendant. After reviewing the record, and comparing this judgment to other judgments in similar cases that have been approved by this Court, and after reviewing the defendant's constitutional claims, I concur in the conditional affirmance of the judgment in this case. However, my concurrence is subject to the caveats expressed in this special writing. My reasons are as follows: (1) this was an action alleging fraud, and, although the evidence was conflicting regarding whether a misrepresentation was made, the jury, as the factfinder, determined that a misrepresentation had been made; and, (2) this Court, on other occasions, has approved substantial penalties levied against defendants under similar circumstances. National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980) (trial judge remitted $3,500,000 jury verdict in an insurance fraud case to $500,000, and this Court affirmed); North Carolina Mut. Life Ins. v. Holley, 533 So.2d 497 (Ala.1987) ($1,000,000 jury award was subjected to a remittitur of $500,000). I realize that this judgment, even after the remittitur, is substantially higher than the judgments approved in those two prior fraud cases, but, according to the statistics furnished to us by Life of Georgia, which appear in Appendix A to this opinion, judgments of this size and greater have been approved by this Court in the past for similar or less egregious conduct. I personally know that to be true, because I have reviewed the records in many, if not all, of the cases coming before this Court.
I have also examined Life of Georgia's claim that this verdict violates its federal constitutional rights. If I were addressing the federal constitutional question without the benefit of all the decisions of the United States Supreme Court on the question, I would agree that Justice O'Connor, in her dissents in Browning-Ferris Industries v. Kelco Disposal, Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), and TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), correctly interpreted the provisions of the United States Constitution on the issue. Of course, her reasoning did not prevail, and my prediction about what the United States Supreme Court would do in Pacific Mutual Life Ins. Co. v. Haslip, 553 So.2d 537, 544 (Ala.1989) (Maddox, J., concurring in part; dissenting in part), was incorrect, because the United States Supreme Court affirmed the decision of this Court. Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).
I have carefully read several of the decisions of the Supreme Court of the United States that address the question of jury awards of punitive damages, and I have read a transcript of the oral arguments in the BMW case, now pending before the United States Supreme Court. Based upon my reading of those cases, and based upon my understanding of the questions asked at oral argument by the Justices in BMW, it appears to me that the Supreme Court of the United States, at this time, requires State justices and judges to review jury awards of punitive damages to ensure that juries do not unreasonably or disproportionately punish a defendant; I have made the required review. It also appears to me that the Supreme Court, in BMW, will address the question whether a State, through a State jury, can punish a defendant not only for misconduct occurring in the State, but also for misconduct occurring outside the State. In BMW, the Court may also address the question whether a defendant, like Life of Georgia in this case, can be punished not once, but twice, for the same or similar misconduct.
On this issue of double punishment, there was evidence presented in this case of an alleged pattern and practice of fraud that involved policies sold not just in Alabama but in other states as well.[14] This fact was argued *706 to the jury, which very well may have considered other out-of-state transactions in its deliberations; such evidence could have influenced the jury's deliberations and the resulting punitive damages award in this case.[15] The issue of allowing a jury to consider evidence of alleged misconduct occurring outside the State is presented in the BMW appeal, but the Supreme Court of the United States has not addressed it yet.
I cannot predict what the Supreme Court of the United States will do in BMW, so I do not know whether a State can successively punish the same defendant in separate civil cases without violating the Double Jeopardy Clause or the Interstate Commerce Clause of the United States Constitution. I do know that in the oral arguments in BMW some of the Justices asked questions relating to these issues. I also know that, as was true in BMW, separate juries, based upon the same or similar evidence of misconduct, can reach alarmingly disparate results. In BMW for example, the jury awarded $4 million in punitive damages; but another jury, hearing much of the same evidence about BMW's alleged misconduct presented by the same attorneys, awarded $0 punitive damages. Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App.1993). In Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala. 1994), which involved another claimant who alleged the same misconduct as that alleged in this case, and who was represented by the same counsel as represents the plaintiff in this case, the jury awarded Ms. Foster $1 million in punitive damages; the jury in this case awarded the plaintiff $15 million. Such disparate awards give some credence to the claims frequently made by defendants that the system of awarding punitive damages in Alabama is much like a lottery.
It would have been helpful to me in reviewing the excessiveness-of-the-verdict claim to have the decision of Supreme Court of the United States in BMW; that case contains some of the same legal questions that are present here, or similar ones. Even without the benefit of that decision, I know that this Court has said that the award of punitive damages is a civil punishment and is for the purpose of altering the behavior of wrongdoers. See, e.g., Pitt v. Century II, Inc., 631 So.2d 235 (Ala.1993), Lozier Corp. v. Gray, 624 So.2d 1034 (Ala.1993), Reserve Nat'l Ins. Co. v. Crowell, 614 So.2d 1005 (Ala.1993), cert. denied, 510 U.S. 824, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993), General Motors Corp. v. Johnston, 592 So.2d 1054 (Ala. 1992), and Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala.1988). The Supreme Court of the United States has said that the awarding of punitive damages for wrongful actions is a form of state regulation that can be as effective as statutory regulations designed to protect consumers and the general public from similar wrongful actions. See San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 780-81, 3 L.Ed.2d 775 (1959).
When businesses are involved in interstate commerce and punishment is rendered against them, additional questions are raised. During the oral arguments in BMW, one or more of the Justices asked whether "interstate commerce enter[ed] the calculus" of determining whether a particular punishment was prohibited; however, the Court has not yet answered the question. The Supreme Court, in BMW, could very well hold as it held in Healy v. Beer Institute, Inc., 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989):
"[T]he `Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State,'.... [A] statute that directly controls *707 commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."
Even though I have some reservations because I do not have the latest expression from the United States Supreme Court, I concur in the conditional affirmance based on the law that the Supreme Court has set out in several of its opinions, and without benefit of an opinion in the BMW appeal. In some respects this case is similar to TXO, but in another respect it is similar to BMW. Factually, it is most similar to Haslip, except that, in Haslip, as I recall, the plaintiff did not present as much evidence of a pattern and practice of misconduct as was presented here against this defendant.[16]

II.
I concur with the majority's decision to require a bifurcated proceeding in all cases, except wrongful death cases, where a punitive damages verdict is returned; but, I would have preferred that the Court not adopt the procedure by caselaw. I would have followed our usual procedure of drafting a proposed rule, giving notice to the bench and bar and other interested citizens, and setting a time within which any person could file comments, pro or con, about the rule. The Court, by setting the effective date of the new procedure as three months after the certificate of judgment issues in this case, does offer the bench and bar, and possibly the Legislature, a limited opportunity to address the new procedure; that opportunity is better than none. I do believe such a procedure will be beneficial to juries and to courts that are called upon to review their findings. I have been concerned for some time about allowing juries to fix an amount of exemplary damages and giving them standardless discretion in doing so. In criminal cases, this State took the power to fix penalties from the jury several years ago and vested the power to sentence in the trial judges. Even in capital cases, the jury can only recommend a sentence to be imposed, after hearing evidence of aggravating and mitigating circumstances; the trial judge is not bound by that recommendation.
I make one further observation. The rule established by the majority opinion excepts wrongful death cases, where only punitive damages can be awarded. Personally, I believe that the Legislature should amend the wrongful death statute to provide for the recovery of compensatory damages, which other jurisdictions allow, but the Legislature, even when adopting the so-called "Tort Reform" package, did not address this issue.

III.
I now come to the portion of the opinion with which I must respectfully disagree. The majority quotes from a special concurrence in BMW, 646 So.2d at 629, and now holds that a plaintiff has no right to recover punitive damages. 684 So.2d at 692. While I agree, in principle, with the Court's holding that punitive damages, in a civil case, are for punishment and that it might be desirable that a portion of the award be paid into the State treasury, I do not believe that this Court has the power, or that it should assume the power, of determining that a portion of an award of punitive damages must be distributed to the State. I believe that the power to collect revenue for the State treasury is a plenary power of the Legislature, and is beyond the powers of this Court.
At least three sections of Alabama's Constitution seem to address this question. Section 42 provides:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which *708 shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
Section 43 provides:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
Furthermore, § 70 provides, in part, that "[a]ll bills for raising revenue shall originate in the house of representatives." It is axiomatic that the judiciary declares what the law is, the Legislature what it shall be. Alabama Life Ins. & Trust Co. v. Boykin, 38 Ala. 510 (1863); Lindsay v. United States Sav. & Loan Ass'n, 120 Ala. 156, 24 So. 171 (1898); Champion v. McLean, 266 Ala. 103, 95 So.2d 82 (1957) (the power to make the law has been committed to the legislature by the Constitution, and the only power of the court is to declare the law as enacted by the legislative branch of government).
This Court has addressed the power of courts to deal with fines in Ellis v. State, 502 So.2d 694 (Ala.1986). Although I did not agree, this Court held that where a district judge, by court order, imposed a traffic fine of $50.00 over the normal fine because the defendant had a radar detector in the automobile, the judge was legislating, even though the fine was within the statutory limits of § 32-5A-8, in that the judicial action created an additional fine, which, under § 43 of the Constitution, could be enacted only by the Legislature.[17]
As I stated earlier, I personally would favor a procedure whereby a portion of punitive damages could be paid into the State treasury, because it would address the troublesome issue of a single plaintiff's receiving a "windfall" or winning a "lottery." I would point out that only a few states have adopted a procedure for requiring the prevailing party in a civil case who recovers punitive damages to pay part of the award to the state general fund. Although the majority opinion states that four states have adopted this practice, my research shows that nine states have adopted statutes requiring the payment of a portion of an award of punitive damages to the state government. The states with such punitive damages legislation are: Colorado (Colo.Rev.Stat. § 13-21-102(4) (1987)), Florida (Fla.Stat. § 768.73(2)(b) (1993 Supp.)), Georgia (Ga.Code Ann. § 51-12-5.1(e)(2) (1993)), Illinois (735 ILCS 5/2-1207), Iowa (Iowa Code § 668A.1(2) (1993)), Missouri (Mo.Rev.Stat. § 537.675(2) (1992 Supp.)), New York (N.Y.Civ.Prac.L. & R. § 8701 (McKinney 1993 Supp.)), Oregon (Or. Rev.Stat. § 18.540(1) (1991)), and Utah (Utah Code Ann. § 78-18-1(3) (1992)). However, the Colorado statute has been held unconstitutional by the Colorado Supreme Court,[18] the Florida statute has been repealed by the Florida legislature, and a federal district court has declared Georgia's statute unconstitutional.[19] In addition, when Colorado and Florida had such laws in effect, they did not allow the attorney for the plaintiff to take a contingency percentage from the portion that was to be allocated to the state.[20]
I would also point out that some recent decisions of the United States Supreme Court suggest that if a state is the recipient of punitive damages awards, such awards may be subject to judicial scrutiny under the Eighth Amendment's Excessive Fines *709 Clause. The Eighth Amendment states that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (Emphasis added.) Although the majority is correct in its assertion that in Browning-Ferris Industries v. Kelco Disposal Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the Supreme Court held that the Eighth Amendment did not apply to the award of punitive damages in a civil case between private parties, in my opinion this case suggests that the Excessive Fines Clause might apply to punitive damages awards where the state receives the proceeds of such awards. Specifically, the Court stated:
"To decide the instant case, however, we need not go so far as to hold that the Excessive Fines Clause applies just to criminal cases. Whatever the confines of the Clause's reach may be, we now decide only that it does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded. To hold otherwise, we believe, would be to ignore the purposes and concerns of the Amendment, as illuminated by its history."
Browning-Ferris Industries, 492 U.S. at 263-64, 109 S.Ct. at 2914. (Emphasis added.)
As indicated by the Court in Browning-Ferris, the history behind the development and adoption of the Eighth Amendment plays an important role in determining its applicability to awards of punitive damages in civil cases.[21] "The Eighth Amendment was based directly on Article I, § 9, of the Virginia Declaration of Rights of 1776, which had in turn adopted verbatim the language of § 10 of the English Bill of Rights." Browning-Ferris, 492 U.S. at 266, 109 S.Ct. at 2914. In 1689, Parliament required William of Orange to accept the provisions of the Bill of Rights as a condition precedent to offering him the throne. Section 10 of the English Bill of Rights had been adopted in order to curb the excessive use of amercements, which had been generously levied by previous English monarchs. Amercements "were payments to the Crown, and were required of individuals who were `in the King's mercy,' because of some act offensive to the Crown." 492 U.S. at 269, 109 S.Ct. at 2917. History suggests that the use of these amercements was to impose penalties for both civil and criminal wrongs committed, and it seems clear to me that Browning-Ferris would have been decided differently had a portion of the civil fine in that case been paid to the government, because the civil fine then would have been similar, in nature, to "amercements," which were defined in Browning-Ferris as follows:
"Amercements were an `all-purpose' royal penalty; they were used not only against plaintiffs who failed to follow complex rules of pleadings and against defendants who today would be liable in tort, but also against an entire township which failed to live up to its obligations, or against a sheriff who neglected his duties."
492 U.S. at 269, 109 S.Ct. at 2917.
History suggests that because of the numerous abuses that occurred from the use of amercements both Magna Carta and the English Bill of Rights placed restraints on their imposition. Based on the historical development of the Eighth Amendment, the Supreme Court, in Browning-Ferris, ruled that the amendment's primary purpose was to curb governmental action, rather than to place restraints on the awards given in civil actions between private parties.[22] 492 U.S. *710 at 268, 109 S.Ct. at 2918-17. In addressing "governmental" versus "private" action, the Court stated that "the text of the [Eighth] Amendment points to an intent to deal only with the prosecutorial powers of the government." Browning-Ferris, 492 U.S. at 275, 109 S.Ct. at 2920. (Emphasis added.) The Court held that the Excessive Fines Clause did not apply to the punitive damages award in the civil case before it, because the state had not "used its civil courts to extract large payments or forfeitures for the purpose of raising revenue or disabling some individual." 492 U.S. at 275, 109 S.Ct. at 2920. (Emphasis added.) The Court warned, however, that the Excessive Fines Clause might apply in cases where punitive damages were awarded and a state government either has "prosecuted the action" or "has any right to receive a share of the damages awarded." 492 U.S. at 264, 109 S.Ct. at 2914. (Emphasis added.) Consequently, there is little doubt in my mind that the decision the Court makes today means that future attacks on punitive damages awarded in this state in civil cases after the effective date of the allocation procedure established by this opinion, will probably be subject to an analysis under the Excessive Fines Clause of the Eighth Amendment. In summary, it appears to me that the decision in Browning-Ferris suggests that where a sovereign "has [a] right to receive a share of the damages awarded," even in a civil case, an Eighth Amendment analysis might be appropriate. 492 U.S. at 264, 109 S.Ct. at 2914. I am of this opinion because the Court observed, in holding that the Eighth Amendment was intended only to restrain governmental action, that when the Eighth Amendment was adopted the word "fine" was "understood to mean payment to the sovereign as punishment for some offense." Browning-Ferris, 492 U.S. at 265, 109 S.Ct. at 2915.
By analyzing the holding in Browning-Ferris, I do not mean to suggest that the Legislature of Alabama could not require the payment of a portion of punitive damages to the State General Fund, because I believe that it could; however, whether the fine is paid to the State by court order or by statute, I believe the amount of any fine in any given case would be subject to an analysis under the Excessive Fines Clause of the Eighth Amendment.
Although the Double Jeopardy Clause of the United States Constitution probably will not be held to apply to a purely civil case, that rule might change if a portion of a punitive damages award is paid to the state. Cf. United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), where the Court held that the constitutional prohibition of double jeopardy required the reduction of a civil award rendered in favor of the United States against a defendant who had previously been subject to criminal sanctions for the same conduct. The Court in Halper discussed whether a civil award could be construed as placing a defendant in double jeopardy, and said:
"[I]n determining whether a particular civil sanction constitutes criminal punishment, it is the purposes actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction, that must be evaluated."
Halper, 490 U.S. at 447, n. 7, 109 S.Ct. at 1901, n. 7. The Court announced that the purpose of the award is controlling under this analysis, rather than whether the action was pursued in a civil or in a criminal context:
"In making this assessment, the labels `criminal' and `civil' are not of paramount importance. It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for purposes of assessing whether a given sanction constitutes multiple punishment barred by the Double Jeopardy Clause, we must follow the notion where it leads. To that end, the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized *711 assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the action as applied in the individual case serves the goal of punishment."
490 U.S. at 448, 109 S.Ct. at 1901-02.
Some of the questions I raise about punishing a defendant more than once may be answered by the Supreme Court in BMW, which is now pending before it, but, whether that Court answers these questions or not, it appears to me that punitive damages are penal in nature and that all the safeguards of both the Alabama Constitution and the United States Constitution would apply. I do know that the Supreme Court of the United States has elected to grant certiorari review, and to write opinions, in at least three cases from this state in the past few years in which the question of excessive punitive damages awards was addressed. I would also point out that my suggestion of adopting a rule that would provide for the recovery of extracontractual damages in insurance cases, including attorney fees, would be preferable and fairer to the litigants, and would not result in the possibility that the attorney for the plaintiff might recover more than the plaintiff and the state, if 50% of the award (after expenses and attorney fees) went to the State, as the majority opinion allows. Another reason why I think compensatory damages, including extracontractual damages, would be preferable to a rule that permits the recovery of punitive damages, is that such a rule would eliminate problems about "windfalls" to one plaintiff and would remove most of the legal problems that could develop when questions of double punishment arise.[23] I know further that in its most recent expression on punitive damages, that Court stated in Honda Motor Co., Ltd. v. Oberg, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), the following:
"Punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express bias against big businesses, particularly those without strong local presences. Judicial review of the amount awarded was one of the few procedural safeguards which the common law provided against that danger."
512 U.S. at 432, 114 S.Ct. at 2340-41.

Summary
On several occasions I have suggested that the Legislature should consider adopting legislation that would protect both the consumer and the insurer in these noncommercial insurance cases. If the statistics appearing in Appendix A are correct, and I have no reason to doubt them, the State of Alabama seems to be out of line with neighboring states in regard to the amount of punitive damages awarded. It appears to me that the legislative branch is the proper forum for addressing any problem that does exist and for making the policy choices that must be made. This suggestion on my part is not new. I first suggested it in my dissenting opinion in Kountz, where I stated that "in our scheme of government, policy questions like [those presented in a bad-faith-failure-to-pay case], especially since they involve the heavily regulated insurance industry, should properly be addressed by the Legislature." 461 So.2d at 812. In that dissent, I also stated why I thought this Court should consider a rule allowing extracontractual damages, suggesting that there very well might be instances when insurance companies pay claims that factually should have been denied, but the company opted to pay the claim rather than face the possibility of a lawsuit. I also suggested that if punitive damages *712 awards in those instances do occur, then premiums for all other policyholders necessarily rise to offset these added costs. On the other hand, I also stated that the proliferation of lawsuits and the size of the jury verdicts suggested consumer dissatisfaction with some practices that were occurring. No doubt, there are instances when companies require policyholders to resort to a lawsuit, even though the insurer's factual basis for denying a claim is questionable. I have previously stated that "[t]he fairest rule, ... in view of these two policy considerations, would be [a procedure] which would allow any party to a noncommercial insurance contract, who is forced to go to court in order to recover his contract claim, to recover his consequential damages as well, including reasonable attorneys' fees." Kountz, 461 So.2d at 813.
Although the imposition of punitive damages can punish and deter, it would appear to me that ideally the legislative branch should make the regulations, and that the executive branch should enforce them fairly, to effect the regulatory purpose of protecting the public welfare. See my opinion in Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1056 (Ala.1987), where I specially concurred and suggested the Legislature should address the public policy concerns relating to punitive damages.

Comments directed specifically to the action on application for rehearing
On original deliverance, I concurred in that portion of the majority opinion affirming the judgment conditionally upon the plaintiff's agreement to remit all but $5,000,000 of the punitive damages awarded, and in that portion of the opinion that adopted a procedure requiring a bifurcation of trials in cases in which claims for punitive damages are presented to a jury. I did so even though I pointed out that this Court generally gives notice to the Bench and Bar before adopting such a substantial change in civil procedure. I still concur as to those two holdings. However, I dissented from that portion of the opinion that establishes the policy of allocating 50% of all punitive damages awards, less attorney fees, to the state's general fund, and I expressed concerns over the constitutional implications raised by this decision. I still dissent in that regard. Because I believe that the rehearing applicants and the amici curiae have raised many meritorious arguments in their applications and briefs in support thereof, I must respectfully dissent from the majority's refusal to address many of the important issues raised on rehearing.
Life of Georgia applied for a rehearing on December 1, 1995, and it has been supported in its position by amici curiae briefs from the Alabama Defense Lawyers Association; the State of Alabama; Blue Cross and Blue Shield of Alabama; Alabama Gas Corporation; Alfa Insurance Company; the Chamber of Commerce of the United States; the Product Liability Advisory Council, Inc.; USX Corporation; the University of Alabama Health Services Foundation, P.C.; Amerex Corporation; and the Wausau Insurance Companies. Life of Georgia and the amici raise several substantial questions, and they point out why the procedure adopted in this case is not only confusing, but also violates Life of Georgia's constitutional rights, both state and federal.
The plaintiff has also filed an application for rehearing. Her application is supported by amicus briefs from the Alabama Trial Lawyers Association and an individual named Mary Lambeth.[24]
Although the majority, no doubt persuaded by the excellent and well-reasoned arguments advanced by both the parties and the amici curiae, has modified the opinion to change the effective date of this caselaw and has cleared up some of the confusion in the original opinion regarding when the new procedure would take effect and which cases would be affected, the majority has not addressed some of the basic constitutional arguments pertaining to separation of powers of government and the legal effect of paying into the general fund of the state a portion of the punitive damages.
*713 I do not separately address the arguments that Life of Georgia and the amici make, but they include substantial legal issues, especially regarding federal constitutional law. I set out some of these concerns in the main portion of my dissent and I do not restate them here.
There is now pending before the United States Supreme Court a case from this Court styled BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994), cert. granted, ___ U.S. ___, 115 S.Ct. 932, 130 L.Ed.2d 879 (1995), in which the petitioner has raised some of the same arguments that are made by Life of Georgia in its application for rehearing. I would have preferred to have the United States Supreme Court's latest expression on the federal constitutional issues raised in BMW before acting on this application for rehearing. My views are that the Eighth Amendment could be implicated where a portion of the punitive damages award goes to the state and that there could be federal constitutional violations where multiple penalties are imposed against a corporation for the same wrongful conduct, where, as here, the wrongful conduct has already been considered in setting the penalty in another case; the wrongful conduct dealt with in this case was considered in Foster v. Life of Georgia, 656 So.2d 333 (Ala.1993) (this Court reinstated a $1 million punitive damages judgment against Life of Georgia for the same conduct complained of in this case). Having read the opinions rendered by the United States Supreme Court and having considered the questions the Justices of that Court are asking during oral arguments in cases involving punitive damages and multiple parties, some of whom may be located outside the forum state, I believe that the judgment in this case presents serious constitutional questions that should be fully answered. See, Honda Motor Corp. v. Oberg, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); Browning-Ferris Industries v. Kelco Disposal, Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Cf. Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 804-08, 107 S.Ct. 2124, 2136-38, 95 L.Ed.2d 740 (1987) (the United States Supreme Court held that counsel for a party that benefits financially from a federal court order may not be appointed as prosecutor in a contempt action alleging a violation of that order). See also, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), which addresses the issue of quasi-criminal statutes.
For these reasons and those stated in the main part of this opinion, I must respectfully dissent from the majority's refusal to address most of the issues raised in the applications for rehearing.
*714 
*715 
*716 
*717 
*718 
*719 BUTTS, Justice (concurring in part and dissenting in part).

I.
I concur in the establishment of a bifurcated trial in cases where a plaintiff seeks punitive damages from a defendant. I believe such a procedural change is within this Court's authority, pursuant to Ala.Code 1975, § 12-2-7. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). However, I would add several caveats.
The majority's opinion states that in the punitive damages portion of the trial, the jury is to be informed of the factors set forth in Ala.Code 1975, § 6-11-23, Hammond, Green Oil, and other case law. 684 So.2d at 691. As a former circuit court judge, I believe that submitting facts and information from other cases, perhaps in an attempt by opposing attorneys to establish the amount of punitive damages awarded by other juries in "comparable cases," will be more confusing and time-consuming than it will be helpful.
Further, taking the Green Oil rule, the majority will have the jury informed of the plaintiff's costs of litigation, including attorney fees. I would either delete this requirement or require that the jury also be informed of the defendant's costs of litigation, including attorney fees.

II.
I respectfully dissent from the majority's holding requiring apportionment of a punitive damages award between the plaintiff and the State. It is for the legislature to determine whether a portion of a punitive damages award should be paid to the State and, if so, what percentage of the award the State should receive, and it is for the legislature to determine the State fund or agency to which the monetary award should be allotted.

III.
As the majority notes, lawsuits and jury awards of punitive damages have become virtually the only effective weapon people have to deter powerful entities from conducting tortious activities within this State. This condition has arisen because the State of Alabama lacks strong consumer protection laws and because the State agencies whose duty it is to enforce the existing body of laws are woefully underfunded. For example, Alabama's Insurance Department, with a scant budget of less than $2 million, a staff of fewer than 30 professional employees, including only 4 consumer protection specialists, is responsible for regulating Alabama's $6 billion insurance industry, composed of 1100 companies.[25]
It is clear that Alabama needs stronger consumer protection laws and a realistic means to enforce them. The majority has now established that that portion of punitive damages allocated to the State will be paid into the General Fund. Common sense dictates, however, that the apportionment should be used to attack the underlying problem at its source. I believe that, if there is to be an apportionment to the State, it should be used to expand and strengthen the department or agency that polices the industry being punished. For example, in a case such as this, where an insurance company is found guilty of consumer fraud, the apportionment should be paid to the Alabama Department of Insurance. The punitive damages award would then become a meaningful investment in deterrence, rather than an unconditional gift to the State's General Fund.
NOTES
[*] Note from the Reporter of Decisions: Publication of this opinion was authorized December 27, 1996. As of that date, however, the Alabama Supreme Court had not issued a certificate of judgment in this case. See the order of the United States Supreme Court in this case, on certiorari review, dated October 15, 1996, ___ U.S. ___, 117 S.Ct. 288, 136 L.Ed.2d 207. The case was, as of December 27, 1996, before the Alabama Supreme Court on remand from the United States Supreme Court, for further consideration.
[1] "Corporate America's fear of juries may be overblown," Business Week, November 8, 1993.
[2] "Civil Jury Cases and Verdicts in Large Counties" is a joint project of the Bureau of Justice Statistics and the National Center for State Courts.
[3] Richard C. Reuben, "Plaintiffs Rarely Win Punitives, Study Says," A.B.A. Journal, p. 26, October 1995.
[4] Statistics according to the State Court Caseload Statistics Annual Report 1992, published February 1994. The report is a joint project of the Conference of State Court Administrators, the State Justice Institute, and the National Center for State Courts Court Statistics Project.
[5] Davis Carr, "Punitive Damages and Post-Verdict Procedures: Where Are We Now and Where Do We Go From Here?" Ala. Lawyer, Vol. 51, March 1990, pp. 94-95. Mr. Carr's article carried the following note: "As to this listing of factors, the author hereby acknowledges `limited plagiarism' from a handout by Danner Frazer, Jr., `How to Handle a Post-Judgment Punitive Damage HearingDiscovery to End,' presented at the Alabama Defense Lawyers Association fall meeting, 1989."
[6] Ill.Rev.Stat. Ch. 110, para. 2-1207 (Supp. 1987); now cited as Ill.St. Ch. 735 § 5/2-1207.
[7] Iowa Code Ann. § 668A.1(2)(b) (West Supp. 1987).
[8] Fla.Stat.Ann. § 768.73(2) (West Supp. 1987); held constitutional in Gordon v. State, 608 So.2d 800 (Fla.1992); repealed by Laws 1992, c. 92-85, § 3, effective July 1, 1995.
[9] Colo.Rev.Stat. § 13-21-102(4) (1987); held unconstitutional in Kirk v. Denver Publishing Co., 818 P.2d 262 (Colo.1991), because a judgment for exemplary damages qualifies as a property interest under Colorado law (there is no right to punitive damages under Alabama law); repealed by Laws 1995, H.B. 95-1090, § 1, effective March 9, 1995.
[10] In Armstrong, we wrote: "In summary, we hold that § 6-11-23(a), § 6-11-24(a), and the parenthetical phrase in the last sentence of § 6-11-23(b) are unconstitutional. Section 6-11-24(b) and the remaining portion of § 6-11-23(b) are constitutional as construed herein." 581 So.2d at 421.
[11] Justice Maddox in his writing, concurring in part and dissenting in part, has attached statistics appearing on pages he designates as Appendix A to his special writing, and he cites the data included on those pages. Those pages appearing as Justice Maddox's Appendix A were not authenticated and were merely attached to a brief filed in this case. The writing on those pages has no probative value.
[12] I realize, of course, this present case does not involve a bad faith failure to pay, but it arose out of a relationship between an insured and an insurer.
[13] I would point out that the statistics given by the majority concerning the percentages of cases won and lost by plaintiff attorneys were not in the record of this case. Although the majority cites these statistics to support the proposition that plaintiffs rarely win cases and that their attorneys often lose "the amount [they have] expended in filing the action and in preparing for trial," 684 So.2d at 694, this proposition is persuasive only if one assumes that all these actions represent valid claims. Barring this assumption, these statistics could be used to argue that a large number of frivolous actions are being filed.
[14] According to the appellant's brief, only one of the witnesses who testified to Life of Georgia's pattern and practice of selling these policies to elderly citizens resided in the State of Alabama. That witness was Mattie Foster, the plaintiff in Foster v. Life Insurance Co. of Georgia, 656 So.2d 333 (Ala.1994).
[15] Ms. Johnson, the plaintiff in this case, testified in the Hammond/Green Oil hearing at the trial level in Ms. Foster's case (see n. 13) as to what Life of Georgia had done to her, and the plaintiffs in both of these cases were represented by the same attorneys. By allowing punitive damages to be awarded in this case, this Court is allowing the defendant to be punished twice for the same conduct. In the oral arguments in BMW, one of the Justices inquired about just such a factual setting, suggesting that permitting a defendant to be punished by every victim might raise constitutional questions.
[16] In the present case, evidence of four incidents, including that against the plaintiff, Ms. Johnson, which could constitute evidence of pattern and practice, was presented before the jury, before the trial court in the Hammond/Green Oil review, and before this Court. However, evidence of one of these incidents was presented by Mattie Foster, the plaintiff in Foster v. Life Insurance Co. of Georgia, 656 So.2d 333 (Ala.1994). In that case, this Court reinstated a jury award for $1 million in punitive damages against Life of Georgia.
[17] In Ellis, I opined that the trial judge had sentenced the defendant for speeding, not for possession of a radar detector.
[18] See, Kirk v. Denver Publishing Co., 818 P.2d 262 (Colo.1991). The Colorado Supreme Court held in this opinion that the statute mandating that a portion of punitive damages awards be paid to the state, Colo.Rev.Stat. § 13-21-102(4), was unconstitutional as violating the Taking Clause of the Fifth Amendment of the United States Constitution.
[19] McBride v. General Motors Corp., 737 F.Supp. 1563 (M.D.Ga.1990).
[20] See, Schenck v. Minolta Office Systems, 873 P.2d 18 (Colo.App.1993); Gordon v. State, 608 So.2d 800 (Fla.1992).
[21] See, Massey, The Excessive Fines Clause and Punitive Damages: Some Lessons from History, 40 Vand.L.Rev. 1233 (1987); Jefferies, A Comment on the Constitutionality of Punitive Damages, 72 Va.L.Rev. 139 (1986), for a further discussion of the historical development of the Eighth Amendment.
[22] The narrowness of the holding in Browning-Ferris seems apparent from a statement made by Justice O'Connor in her concurring/dissenting opinion in that case, where she cites a Florida statute (Fla.Stat. § 768.73(2)(b), which has since been repealed by the Florida Legislature, effective July 1, 1995), which mandated that 60% of any punitive damages awarded be allocated to the state. In reference to this statute, Justice O'Connor stated:

"I also note that by relying so heavily on the distinction between governmental involvement and purely private suits, the Court suggests that the Excessive Fines Clause will place some limitations on awards of punitive damages that are recovered by a governmental entity."
492 U.S. at 298-99, 109 S.Ct. at 2932.
[23] The attorney for the plaintiff in this case argued to the jury in the Foster case, and again to the jury in this case, that Life of Georgia should be punished for selling these policies to elderly people. The question arises: How many times can a defendant be punished through exemplary damages? In BMW, the Justices, during oral arguments, made specific inquiry about the "multiplier" effect of permitting several plaintiffs to argue similar claims to separate juries. Cf., Dennis Neil Jones, et al., Multiple Punitive Damages Awards for a Single Course of Wrongful Conduct: The Need for a National Policy to Protect Due Process, 43 Ala.L.Rev. 1 (1991).
[24] Mary Lambeth is the plaintiff in a federal action based on the Alabama Wrongful Death Act. Her federal claim involves alleged asbestos exposure.
[25] Jerry Underwood, "Big Money Fight," Birmingham News, November 5, 1995, at 8A.